[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 15-14830

_____

D.C. Docket No. 1:15-cr-20032-DPG-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

STANLEY PRESENDIEU,
SCARLEE VALIAS JEAN,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

(January 19, 2018)

Before JORDAN, HULL and BOGGS,[*] Circuit Judges.

HULL, Circuit Judge:

After their guilty pleas, defendant Stanley Presendieu appeals his convictions and defendant Scarlee Valias Jean appeals her sentence. Having carefully reviewed the record and the parties' briefs, and with the benefit of oral argument, we (1) affirm Presendieu's convictions and (2) vacate Jean's sentence and remand for further proceedings.

## I.    BACKGROUND

This case involves an illegal check-cashing scheme in which both defendants participated. At the time of their guilty pleas, both defendants stipulated to factual proffers that outlined their crimes.

## A.    Habib and Kwik Stop

In their factual proffers, both defendants admit the following facts about their illegal check-cashing scheme with Husein Habib.

From 2010 to 2014, Habib owned and operated Noor Enterprises of South Florida, LLC, which did business as Kwik Stop Food Store ("Kwik Stop"). At Kwik Stop, Habib cashed legitimate checks for customers. In addition, Habib provided illicit check-cashing services to defendants Presendieu and Jean, as well

---

[*]Honorable Danny J. Boggs, United States Circuit Judge for the Sixth Circuit, sitting by designation.

as others, in return for a percentage of the value of each check.  Habib would cash checks for Presendieu and Jean, which they had unlawfully obtained and on which they had forged endorsements.  To provide these illicit check-cashing services, Habib maintained business checking accounts at "FDIC insured financial institutions including Wachovia, Bank of America, and SunTrust."

The defendants unlawfully obtained checks from a variety of sources. For example, Presendieu admitted that many of his checks were either "United States Treasury checks that had been stolen from the mail" or "Treasury or cashier's checks obtained through filing fraudulent tax returns that made false claims for refunds."  Likewise, Jean admitted that she unlawfully obtained "mainly government checks" and that she would get "cashier's checks around tax season time."

When cashing a check with Habib, the defendants forged the payee's endorsement, and Habib required the defendants to provide documents with falsified identification in the names of the payees listed on the checks.  Habib scanned the falsified identification,[1] along with the forged endorsements on the checks themselves, and stored the images in his Kwik Stop computer records.

---

[1]These identifications would often consist of paper containing the image of a falsified driver's license.  Once scanned, these images would appear like an actual driver's license.  The papers with these images were then dumped in the trash.  Law enforcement recovered dozens of these documents from a search of Kwik Stop and other sources.  Many of the photographs used

3

In June 2013, unbeknownst to the defendants, federal law enforcement officers uncovered Habib's illegal check cashing, executed a search warrant on the premises of Kwik Stop, and seized a computer and various records. As a result, Habib agreed to cooperate with the investigation and made numerous audio–visual recordings of the defendants and other individuals cashing checks with forged endorsements and discussing the falsification of the payee-identification documents.

## B.    Presendieu's Factual Proffer

Throughout 2010 and 2011, codefendant Jason Miles brought Habib hundreds of unlawfully obtained checks with forged endorsements and counterfeit identification documents for the payees. Miles and Habib later had a falling out, and Miles introduced defendant Presendieu to Habib as a "resource for cashing illicit checks."

As early as March 2012, defendant Presendieu used Habib's service to cash a variety of unlawfully obtained checks, including checks stolen from the mail and checks obtained through filing fraudulent tax returns. Many of the fraudulent tax refund checks that Presendieu cashed through Kwik Stop were from returns filed through B.D. Tax Services, a company registered to codefendant Latasha Pharr.

---

for the falsified identifications matched images for other individuals, who were not named on the checks, but appeared on public websites, such as those displaying photographs of prison inmates.

4

At one of the recorded meetings, Presendieu warned Habib "not to talk to law enforcement, instructing him to keep his mouth shut and he'll be safe." In a later recording, Presendieu stated that he had checks to cash but still needed to "pay for 'faces,' in the amount of $100 for each 'face' and $100 for the real driver's license number." At this meeting, Presendieu produced five United States Treasury checks. In a recording dated September 20, 2013, Presendieu told Habib that he would begin using identifications with real driver's license numbers and admitted that the numbers he had used in the past were not real.

Habib also recorded a meeting on October 2, 2013, in which Presendieu presented a United States Treasury check in the amount of $17,800 made payable to a victim identified in the indictment as "U.O." The following day, Presendieu returned with a counterfeit driver's license purportedly for U.O. and told Habib that the license number on the counterfeit identification was real. When Habib objected that the name was misspelled and the check was not endorsed, Presendieu forged U.O.'s signature on the back of the check. In an interview with federal agents, U.O. later confirmed that the signature was not his own, that he had not authorized Presendieu to endorse checks for him, and that the driver's license Presendieu presented was fake.

On October 4, 2013, Habib recorded Presendieu's producing a Florida driver's license with the correct spelling of U.O.'s name and several additional

5

United States Treasury checks.  Habib again objected to the driver's license for U.O., noting that it had a "black guy's face on a Jewish name."  Presendieu reviewed the additional checks and discussed the names and races he would make for each check's identification.  Presendieu then discussed splitting the check proceeds with Habib on a 60/40 basis and advised that his contacts had more checks, amounting to at least $50,000 in increments of less than $1,000.  On October 5, Presendieu provided copies of ten driver's licenses and endorsed a check made payable to a victim identified as "R.R."

On October 7, 2013, Presendieu and Habib discussed how long they had known each other.  Habib indicated that "in 2012, [Presendieu] gave him 300 checks and the bank rejected half of them because the real payees had not endorsed them."  Presendieu recalled that the early checks he brought to Kwik Stop were cashier's checks and that he started bringing "statue" [United States Treasury] checks in the summer.

On October 14, 2013, Presendieu introduced Habib to codefendant Jean. In Presendieu's presence, Jean explained to Habib her source for obtaining checks and the connections she had to conceal her fraudulent check-cashing activities.

By June 2014, Habib began to make audio–visual and audio recordings of Latasha Pharr, who also brought unlawfully obtained checks to cash at Kwik Stop. In these recordings, Pharr discussed her previous relationship with Presendieu.

6

Pharr mentioned checks that Presendieu brought to Kwik Stop to cash, referencing her role in the production of those checks and claiming that Presendieu failed to pay her for them.

## C.    Jean's Factual Proffer

In a separate factual proffer, Jean admitted that Habib recorded her engaging in illegal check-cashing activity. Jean's factual proffer also contains information, identical to that recounted above, about Habib and his methods for cashing unlawfully obtained checks.

On October 14, 2013, the day of their initial meeting, Habib recorded defendant Jean saying that she had "partners that have tax fraud things going on." Jean also told Habib that she had "an ID guy who gets ID's to her so that nothing can be traced." Jean told Habib that she expected 70 percent of the proceeds from the cashed checks. When Habib suggested a meeting with his cousin who cashes checks, Jean responded that she did not want to take any risks. Later, in a recorded phone call on October 17, 2013, Presendieu informed Habib that Jean and her associate were scared because Habib's cousin "sound[ed] like he [was] the police."

In a recorded phone call on October 24, 2013, Jean and Habib discussed— among other things—that Jean's "ID guy had returned to Pakistan and would not be back until February." They also discussed the size of the checks that Jean could

7

bring to Habib, and Jean "assure[d] Habib that she [would] bring the right information for checks and correct identification."

In a recorded meeting on October 25, 2013, a relative of Jean's brought Habib a check in the amount of $21,366, made payable to an individual identified in the indictment as "J.W." When Habib complained that the endorsement signature on the check was different from the signature on the identification, the relative called Jean via speaker phone. During this call, Jean admonished her relative for referring to her as Scarlee instead of "Jasmine" or "Sky." Jean then verbally confirmed that "the social security number for the check [was] correct" and told Habib that "she won't go lower than [a] 60/40" split of the check's proceeds.

Habib also recorded an October 28, 2013 meeting with Jean during which Jean presented four checks totaling $15,000 and four Florida identification cards. For one of these checks, which was in the amount of $12,000, Jean agreed to furnish a social security number.

At another recorded meeting, on October 30, Jean confirmed that she "forwarded" the social security number for the $12,000 check. Habib also returned the $21,366 check payable to victim J.W., telling Jean that the amount payable was too large and that "the signatures [on the check and identification did] not match." Habib gave Jean partial payment for the other checks that had been cashed, and

8

Jean discussed again "her source for identification documents." Jean also told Habib that she "does $20-30,000 every week" in illicit checks and that she expected to have "a load of checks to cash" in December and January from a "tax season company."

On November 6, 2013, Jean was recorded giving Habib six checks totaling $34,500 and corresponding Florida identification cards. When Habib commented that the picture on one of the identification cards had been used before, Jean responded that "she [did] not think her ID people" would use a duplicate photo because "it would be dumb." Jean then described herself as "a boss," but claimed that the "real boss" was in Atlanta. Jean then stated that she did not work for anyone and that she "pays people for checks and identification." Jean and Habib reviewed Jean's checks, and Habib noted that they totaled $34,500.

In another recorded meeting, on November 13, 2013, Jean expressed concern because someone walked by and took a picture of her vehicle's tag. Habib paid Jean $9,000 for previous checks and asked her to initial a document showing that she received payment. Jean did not want to initial any documents. They then discussed Presendieu, and Habib told Jean that he would no longer do business with her because she was still connected to Presendieu.

On November 15, 2013, Jean told Habib that her boss was coming to "straighten things out." Jean returned with codefendant Brian Deronceler, who

9

described himself as a "boss" and explained that he was not associated with Presendieu. Deronceler produced four checks and corresponding Florida identification cards, and Habib told Deronceler that one of the identification photos had been used with another check. Nonetheless, Habib agreed that he would try to cash these checks.

In her factual proffer, Jean stipulated that federal agents identified and interviewed a number of individuals whose names appeared on stolen United States Treasury checks that Jean had brought to Habib to cash. All of these victims confirmed that Jean was not authorized to possess their checks, cash those checks, or use their signatures.

Because the defendants raise wholly different issues on appeal, we discuss their cases separately.

## II.    PRESENDIEU'S APPEAL

Because Presendieu challenges his guilty plea, we review his indictment, his plea colloquy, Federal Rule of Criminal Procedure 11(b), and relevant case law.

### A.    Presendieu's Indictment and Plea Agreement

After being indicted on 15 federal charges relating to the check-cashing scheme, Presendieu pled guilty to only two charges: (1) conspiracy to commit bank fraud, in violation of 18 U.S.C. § 1349 (Count 1), and (2) aggravated identity theft, in violation of 18 U.S.C. § 1028A (Count 31). In the written plea agreement, the

10

government agreed to dismiss the remaining thirteen counts in the indictment, and Presendieu waived his right to appeal his sentence, so long as it did not exceed the statutory maximum penalty and was within the advisory guidelines range established by the district court at sentencing.

In addition to the plea agreement, Presendieu signed a seven-page, detailed "Factual Proffer in Support of Guilty Plea."  As outlined above, in the factual proffer, Presendieu admitted that he used Habib's illicit check-cashing services and that Habib maintained business checking accounts at federally insured banks. Presendieu further admitted to cashing through Habib many stolen, fraudulent, or unlawfully obtained checks, forging endorsements on them, and using false identification documents to cash them.

## B.    Plea Colloquy

On August 6, 2015, the district court held a change-of-plea hearing pursuant to Rule 11(b).  The district court explained to Presendieu that "Count 1 charges you with conspiracy to commit bank fraud in violation of [18 U.S.C. § 1349]" and "Count 31 charges you with aggravated identity theft in violation of [18 U.S.C. § 1028A]."  When the district court asked whether Presendieu intended to plead guilty to these charges, Presendieu responded, "Correct, sir."

By way of personal background, Presendieu stated that he was 33 years of age and had a high school diploma.  When asked whether he was "under the

11

influence of any alcohol, narcotics or medication," Presendieu responded in the negative.  When asked whether he had "ever been diagnosed or treated for a mental illness," Presendieu responded, "No, sir."

When asked by the district court, Presendieu confirmed that he had signed his written plea agreement and was "able to read and understand all of [its] terms." Presendieu further confirmed that he had "enough time to discuss everything that's contained in the written plea agreement with [his] attorney."

Turning to the specific terms of the written plea agreement, the district court asked whether Presendieu was aware that, in exchange for pleading guilty to Counts 1 and 31, the government would dismiss the remaining counts against him. Presendieu stated that he understood.  As to the possible punishments, Presendieu acknowledged his understanding that Count 1 carried a maximum sentence of 30 years' imprisonment, that Count 31 carried a mandatory minimum of two consecutive years' imprisonment, and that he would be responsible for restitution in excess of $2,500,000.  The district court also confirmed that Presendieu understood the application of the sentencing guidelines and had an opportunity to discuss those matters with his attorney.

When the district court asked whether he had "any questions at all about anything that is set forth in [the] written plea agreement," Presendieu responded, "No, not at all, sir."  When asked again whether he had "had enough time to speak

12

to [his] attorney about everything that's set forth in the written plea agreement," Presendieu replied in the affirmative.  Presendieu confirmed that no one had promised him anything in return for his plea other than what was set forth in the written agreement and that no one had threatened him or forced him to enter the plea.

The district court then reviewed with Presendieu all of the rights he was waiving and losing by entering a guilty plea.  Presendieu affirmed his understanding that he was forgoing his rights to a jury trial, to be represented by an attorney during trial, to have the government prove the charges against him beyond a reasonable doubt, to cross-examine the government's witnesses, and to call his own witnesses and compel their appearance by subpoena.  Presendieu also confirmed his understanding that an adjudication of guilt on Counts 1 and 31 would deprive him of certain rights, including the rights to vote, to hold public office, to serve on a jury, to possess a firearm, to reside in certain public housing, and to maintain certain professional licenses.  When asked whether he discussed these consequences with his attorney, Presendieu responded, "Yes, sir."

The district court again asked whether Presendieu had "had enough time to discuss this case and this plea with [his] attorney," to which Presendieu replied, "Yes, sir."  Presendieu stated that he and his attorney discussed all possible defenses that he might have raised to the charges in the indictment and that he had

13

no trouble communicating with his attorney.  Presendieu averred that his attorney carried out his wishes and that he was fully satisfied with his attorney's representation.

As to the factual basis for the plea, Presendieu affirmed that he had signed the factual proffer accompanying his written plea agreement.  The district court asked whether Presendieu was "able to read and understand everything contained in the written factual proffer," to which he responded, "Yes, sir."  Presendieu also answered affirmatively that he had had "enough time to discuss what's contained in the proffer" with his attorney.

When the district court asked Presendieu whether all of the information in the factual proffer was accurate, Presendieu consulted with his attorney, who informed the district court that Presendieu could not specifically recall making the statement appearing in the first paragraph on page five of the proffer.  The government stated to the district court that defense counsel might be referring to the paragraph about the October 7, 2013 meeting, during which Presendieu discussed how long he had known Habib and recalled that the early checks he brought to Kwik Stop were cashier's checks and that he started bringing "statue" checks in the summer.  Presendieu's attorney then clarified that although Presendieu could not recall making specific statements during that meeting, it was entirely possible that he had made them.  Presendieu confirmed that all other facts

14

in the written proffer were true and accurate, and Presendieu's attorney stipulated that there was a factual basis for the guilty plea.

When asked how he pled to Counts 1 and 31, Presendieu responded, "Guilty."  Based on the plea agreement, the factual proffer, Presendieu's responses to the district court's questions, and its observation of Presendieu during the proceedings, the district court made these findings of fact:  (1) that Presendieu "freely, voluntarily and intelligently waived [his] rights[;]" (2) that he "knowingly and voluntarily" entered his guilty plea; (3) that he "underst[ood] the nature of the charges and the consequences of [his] plea[;]" and (4) that there was "a factual basis for the plea."  The district court thus accepted Presendieu's plea and adjudicated him guilty on Counts 1 and 31.  Presendieu did not object to the district court's findings or to its acceptance of his plea.

The district court sentenced Presendieu to a total term of 212 months' imprisonment—188 months for conspiracy to commit bank fraud (Count 1) and a consecutive term of 24 months for aggravated identity theft (Count 31).  The district court also ordered Presendieu to pay $2,594,839.33 in restitution.[2]

---

[2]In his plea agreement, Presendieu agreed to restitution in the amount of $2,594,839.39, which is effectively the same amount.  The district court also used this $2,594,839.39 sum for the loss amount in calculating Presendieu's guidelines range.  However, the actual written final judgment uses the figure $2,594,839.33, and thus we use that $2,594,839.33 figure in the text of the opinion.

Presendieu initially appealed his convictions and the validity of his sentence. On the government's motion, this Court dismissed the sentence portion of Presendieu's appeal pursuant to the sentence appeal waiver in his written plea agreement. Before the Court now is only Presendieu's challenge to the validity of his convictions.

Presendieu complains that his guilty plea is procedurally defective under Rule 11 and unconstitutional because the district court failed to inform him of the nature of the charges, never outlined separately each element of his two offenses, and never asked him whether he understood those elements. Presendieu acknowledges that he raised no constitutional or Rule 11 objections before the district court. Instead, for the first time on appeal, he objects to the plea colloquy and his plea as defective.

## C.    Standard of Review

When a defendant raises issues for the first time on appeal, we review these issues for plain error only. United States v. Moriarty, 429 F.3d 1012, 1018–19

---

Presendieu's conduct included both his checks and the checks cashed by his co-conspirators. For example, codefendant Pharr allowed Presendieu to establish a fraudulent tax preparation service, B.D. Tax Services, Inc., in Pharr's name. Pharr also had her own tax preparation service, which operated under the name Pharr's Taxes Inc. Both of these tax preparation services used stolen identification information to file fraudulent tax returns. The PSR indicated that, in 2012 alone, with Pharr's help, Presendieu presented more than $250,000 in fraudulent checks for Habib to cash. During a recorded phone call, Pharr told Habib that Presendieu cashed $253,000 worth of her checks without paying her for them, and bank records revealed that around $256,000 in B.D. Tax Services checks were cashed at Kwik Stop in 2012.

16

(11th Cir. 2005). Presendieu bears the burden of showing that "there is (1) error, (2) that is plain, and (3) that affects substantial rights." Id. at 1019 (citation omitted); see United States v. Vonn, 535 U.S. 55, 62–63, 122 S. Ct. 1043, 1048 (2002) (holding that plain-error review, not harmless-error review, applies when reviewing whether a Rule 11 error affected substantial rights).

Even if Presendieu can satisfy these conditions, we may recognize the forfeited error only if it "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." Moriarty, 429 F.3d at 1019 (alteration in original) (quoting United States v. Olano, 507 U.S. 725, 732, 113 S. Ct. 1770, 1776 (1993)). In other words, under plain-error review in a Rule 11 challenge, a defendant who was silent below has the burden to show not only that the error is plain and prejudicial but also that it is "disreputable to the judicial system." Vonn, 535 U.S. at 65, 122 S. Ct. at 1050.

## D.    Due Process and Rule 11 Principles

The foundational principles governing guilty plea procedures derive from constitutional notions of due process. Because a guilty plea involves the relinquishment of several constitutional rights and privileges, it must be entered voluntarily and knowingly. McCarthy v. United States, 394 U.S. 459, 466, 89 S. Ct. 1166, 1171 (1969). A guilty plea is voluntary in the constitutional sense where the defendant "received 'real notice of the true nature of the charge against him.'"

17

Henderson v. Morgan, 426 U.S. 637, 645, 96 S. Ct. 2253, 2257 (1976) (quoting

Smith v. O'Grady, 312 U.S. 329, 334, 61 S. Ct. 572, 574 (1941)).

Building upon these fundamental constitutional principles, Rule 11(b) sets

out procedures that district courts must follow when accepting guilty pleas.  See

Fed. R. Crim. P. 11(b).  These procedures are designed to address the three "core

objectives" necessary for a knowing and voluntary guilty plea: (1) that the

defendant enters his plea free from coercion, (2) that he understands the nature of

the charges, and (3) that he understands the consequences of his plea.  See Gordon

v. United States, 518 F.3d 1291, 1298 (11th Cir. 2008); United States v. Monroe,

353 F.3d 1346, 1354 (11th Cir. 2003); United States v. Camacho, 233 F.3d 1308,

1314 (11th Cir. 2000); United States v. Mosley, 173 F.3d 1318, 1322 (11th Cir.

1999).

Addressing the second of those core objectives, Rule 11(b) provides that the

district court must assure that the defendant is informed of and understands "the

nature of each charge," as follows:

> **(b) Considering and Accepting a Guilty or Nolo Contendere Plea.**
>
> **(1) Advising and Questioning the Defendant.**  Before accepting a plea of guilty or nolo contendere, the defendant must be placed under oath, and the court must address the defendant personally in open court.  During this address, the court must inform the defendant of, and determine that the defendant understands, the following:
>
> > . . . .
>
> **(G)** the nature of each charge to which the defendant is pleading . . . .

18

Fed. R. Crim. P. 11(b)(1)(G).  There is no rigid formula or "mechanical rule" for determining whether the district court adequately informed the defendant of the nature of the charges.  Camacho, 233 F.3d at 1314.  Importantly, Rule 11 does not specify that a district court must list the elements of an offense.  See Fed. R. Crim. P. 11(b)(1)(G); see also United States v. Wiggins, 131 F.3d 1440, 1442–43 (11th Cir. 1997) (per curiam).  Rather, what constitutes an adequate plea colloquy varies from case to case depending on the complexity of the charges and the defendant's intelligence and sophistication.  See United States v. Telemaque, 244 F.3d 1247, 1249 (11th Cir. 2001) (per curiam); Camacho, 233 F.3d at 1314; Mosley, 173 F.3d at 1323–24; United States v. DePace, 120 F.3d 233, 237 (11th Cir. 1997).  As this Court has explained, the Rule 11 "colloquy may be done in different ways depending on various factors."  Wiggins, 131 F.3d at 1443; see Telemaque, 244 F.3d at 1249; United States v. Lopez, 907 F.2d 1096, 1099 (11th Cir. 1990); United States v. Byrd, 804 F.2d 1204, 1206–07 (11th Cir. 1986).  District courts must ensure, one way or another, that the defendant knows and understands the nature of the offenses to which he or she is pleading guilty.

In simple cases, for example, the district court may only need to read the indictment and afford the defendant an opportunity to ask questions.  Camacho, 233 F.3d at 1314.  The district court may be required to give a more detailed explanation, however, in more complex cases, such as those involving "esoteric

19

terms or concepts unfamiliar to the lay mind." United States v. James, 210 F.3d 1342, 1345 (11th Cir. 2000) (per curiam) (quoting DePace, 120 F.3d at 237).

Notably too, in some cases, a factual proffer may set forth in such detail the facts of the crime that it effectively incorporates the substance of the elements of the offense. See Wiggins, 131 F.3d at 1442. In Wiggins, the district court prefaced a recitation of the proffer by telling the defendant to "listen as [the prosecutor] tells me what she contends you did to take by force or violence from the possession of a person or a federally insured bank money of a certain amount." Id. at 1441. Although this preface, in effect, covered the elements of the offense, the defendant argued on appeal that this preface was "only a 'passing reference to elements of the crime of bank robbery' at a time in the colloquy when the defendant was hearing the facts in the case and thus would not understand the significance of what he was being told by the district court." Id. at 1442. In finding no plain error in Wiggins, this Court pointed out that (1) the district court at least incorporated the substance of the elements of the charge when it told the defendant to listen to the government's factual proffer, (2) the defendant unequivocally admitted to committing the crime, and (3) based on its observation of the defendant, the district court made a factual finding that the defendant entered an informed guilty plea. Id. Here the district court did not explicitly state the elements of the charge in its own

20

voice, but all of the necessary factual material was contained in the proffer as recited.

Yet, this Court has held that the district court plainly errs where its plea colloquy is so deficient that it results in a total or abject failure to address Rule 11's core principle, to wit that a defendant understands the nature of the charges against him.[3] See, e.g., Telemaque, 244 F.3d at 1249–50; James, 210 F.3d at 1343–46; United States v. Quinones, 97 F.3d 473, 474–75 (11th Cir. 1996) (per curiam), abrogated in part by Vonn, 535 U.S. at 74–75, 122 S. Ct. at 1054–55 (holding that courts may consider the whole record when considering whether a Rule 11 violation occurred or resulted in prejudice). In Monroe, this Court distinguished these plain-error-reversal cases as "involv[ing] not only violations of explicit requirements of Rule 11, but also violations that resulted in a total or almost total failure to address a Rule 11 core concern." 353 F.3d at 1355.

Importantly, in making the foregoing determination, a district court's fact findings—that the defendant understood the nature of the charges and that the

---

[3]To show that a plain error under Rule 11 warrants relief, the defendant must also show a reasonable probability that, if not for the error, he would not have entered a guilty plea. United States v. Evans, 478 F.3d 1332, 1338 (11th Cir. 2007) (quoting United States v. Dominguez Benitez, 542 U.S. 74, 83, 124 S. Ct. 2333, 2340 (2004)); Moriarty, 429 F.3d at 1020. Presendieu has not made this showing because he has not cited any evidence showing that he otherwise would not have pled guilty.

Furthermore, even if there was plain error in the Rule 11 colloquy, we conclude that given the factual proffer, which was admitted by Presendieu, the error did not affect the integrity of the proceeding.

21

defendant had entered a knowing and voluntary plea of guilty—are subject to review only for clear error.  Wiggins, 131 F.3d at 1443; Lopez, 907 F.2d at 1099. This is because "[t]hese matters are better committed to the good judgment of the district judge, who observes the defendant's demeanor, life experience, and intelligence."  Mosley, 173 F.3d at 1323 (citations omitted).

Our task here, then, is to review the record as a whole and determine, under the particular factual circumstances presented, whether Presendieu "'understood what he was admitting and that what he was admitting constituted the crime charged.'"  Id. at 1324 (quoting Lopez, 907 F.2d at 1099).

### E.    The District Court Did Not Plainly Err

Here, Presendieu has not shown plain error.  We discuss the elements of Presendieu's two crimes and then explain why the district court's questions and findings, along with Presendieu's admission to the detailed factual proffer, establish that Presendieu understood the nature of the charges and that his plea was knowing and voluntary, as the district court explicitly found.

To convict for the substantive offense of bank fraud, the government must prove "(1) that a scheme existed to obtain moneys, funds, or credit in the custody of a federally-insured bank by fraud; (2) that the defendant participated in the scheme by means of material false pretenses, representations or promises; and (3) that the defendant acted knowingly."  United States v. McCarrick, 294 F.3d

22

1286, 1290 (11th Cir. 2002); see 18 U.S.C. § 1344. To convict for a conspiracy to commit bank fraud, the government must establish that "(1) a conspiracy existed; (2) the defendant knew of it; and (3) the defendant knowingly and voluntarily joined it." United States v. Moran, 778 F.3d 942, 960 (11th Cir. 2015) (citation omitted); see 18 U.S.C. § 1349.

To convict for aggravated identity theft, the government must prove "that the defendant: (1) knowingly transferred, possessed, or used; (2) the means of identification of another person; (3) without lawful authority; (4) during and in relation to a felony enumerated in [18 U.S.C.] § 1028A(c)." United States v. Barrington, 648 F.3d 1178, 1192 (11th Cir. 2011) (quoting United States v. Hurtado, 508 F.3d 603, 607 (11th Cir. 2007) (per curiam)); see 18 U.S.C. § 1028A. Bank fraud is one of the predicate felony offenses enumerated in § 1028A(c). See 18 U.S.C. § 1028A(c)(5).

Presendieu contends that these two crimes are so complex as to require a listing and explanation of each element of the offenses. We disagree for several reasons. First, Presendieu points to no decision that treats conspiracy to commit bank fraud or aggravated identity theft as complex or complicated, and our research reveals none. Cf. James, 210 F.3d at 1345–46 (concluding the Travel Act racketeering offense at issue was so complex as to require a detailed explanation of the charge before accepting a guilty plea).

23

Second, after our own review of the statutory elements of these two crimes, we conclude they are not crimes of "extreme complexity." See id. at 1345. These two offenses do not include any concepts so esoteric or unfamiliar to the layperson as to require a detailed listing or explanation of each element of the offense.

Third, even if these crimes are considered to be more complex than the simplest crimes, the detailed nature of the seven-page factual proffer accompanying Presendieu's written plea agreement and his express assent to that proffer show that Presendieu well understood the nature of the two charges against him. As to conspiracy to commit bank fraud, Presendieu admitted facts in his proffer amply sufficient to prove that he knowingly and voluntarily participated in an illegal check-cashing scheme with Habib, Jean, and others to obtain money by means of false endorsements and false identification documents and by cashing unlawfully obtained checks. The proffer even included the factual detail that Habib's business checking accounts, which were used to process and cash the illicit checks, were maintained at "FDIC insured financial institutions." As to aggravated identity theft, the admitted facts showed that Presendieu knowingly used falsified identification information of other persons, without lawful authority, during and in relation to his bank fraud scheme. There can be no question that the proffer established an adequate factual basis for Presendieu's guilty pleas and that it contained all of the elements of his two offenses.

24

Fourth, nothing in the record here indicates that Presendieu lacked the intelligence or sophistication to understand the nature of the offenses to which he was pleading guilty.  Indeed, the record and the mechanics of his fraudulent scheme show just the opposite is true.  Presendieu knew his actions were unlawful and he never indicated any misunderstanding of the charges.  Presendieu said, "Yes, sir," when asked if he was "able to read and understand everything contained in the written factual proffer" and whether he had "enough time to discuss what's contained in the proffer" with his attorney.

In fact, Presendieu had the presence of mind to point out a particular factual statement that he could not recall, but clarified by counsel that he may well have made that statement.  As to all other statements in the factual proffer, Presendieu agreed that they were accurate.  This exchange demonstrates the clarity of Presendieu's understanding of the nature of the charges against him and the way that the facts applied to those charges.  See Wiggins, 131 F.3d at 1442–43 (stating that there is no requirement that the district court list each element of the charged offense seriatim and that "there is no one mechanical way or precise juncture that a district court is required to inform the defendant of the nature of the charges in the Rule 11 colloquy").[4]

---

[4]This case is distinguishable from Gaddy v. Linahan, 780 F.2d 935 (11th Cir. 1986), where the district court failed to explain the elements of "malice murder," and specifically the

25

Fifth, the district court here made the express findings that Presendieu entered his pleas voluntarily and intelligently and that, at the change of plea hearing, Presendieu demonstrated an understanding of the nature of the charges against him. See Wiggins, 131 F.3d at 1441–43. Even without plain-error review, Presendieu has not carried the burden of showing that these findings are clearly erroneous. See id. at 1443.

In summary, the record as a whole establishes that Presendieu:  (1) was aware of the charges to which he was pleading guilty, (2) was sufficiently intelligent to understand the nature of those charges, (3) understood that the facts set forth in the factual proffer established that he was guilty of those two particular offenses, (4) had discussed the two charges and the facts in the proffer with his attorney, and (5) unequivocally and intelligently pled guilty to both charges in the plea agreement.  Under these circumstances, we conclude that the district court did not plainly err, either as a matter of constitutional due process or under Rule 11, in accepting Presendieu's guilty plea.  Accordingly, we affirm Presendieu's convictions for conspiracy to commit bank fraud (Count 1) and aggravated identity theft (Count 31).[5]

---

term "malice aforethought," to a criminal defendant who was shown to be "not very intelligent," "illiterate," and "mentally retarded to some degree." See id. at 941, 943, 945.

[5]The task of performing a Rule 11 colloquy is important.  To help judges, the Federal Judicial Center publishes the Benchbook for U.S District Court Judges, which is "an ongoing

26

## III.    JEAN'S APPEAL

Jean appeals only her sentence.  We accordingly limit our discussion to her indictment, presentence report ("PSR"), and sentencing.

### A.    Jean's Indictment and Guilty Plea

The same indictment that charged Presendieu also charged Jean with eleven federal offenses relating to her illegal check-cashing activities.  In a written plea agreement accompanied by a detailed factual proffer, Jean agreed to plead guilty to conspiracy to commit bank fraud, in violation of 18 U.S.C. § 1349 (Count 1), and aggravated identity theft, in violation of 18 U.S.C. § 1028A (Count 35).  In return, the government agreed to dismiss the remaining nine counts against Jean.  After a change of plea hearing held on August 6, 2015, the district court accepted Jean's plea and adjudicated her guilty of Counts 1 and 35.

### B.    Presentence Report

A probation officer prepared Jean's PSR, which outlined, inter alia, Jean's and codefendant Deronceler's conduct in the check-cashing conspiracy.

Jean's PSR indicated that she was responsible for an intended loss of $193,132.53.  That figure included three components:  (1) Jean's presentation of

---

compilation of information that federal judges have found useful for immediate bench or chambers reference in civil and criminal proceedings." See Federal Judicial Center, Benchbook for U.S. District Court Judges (March 1, 2013), available at https://www.fjc.gov/content/bench book-us-district-court-judges-sixth-edition-0.  The Benchbook contains sections on such topics as taking guilty pleas. Id. at 63–73.  We encourage judges to take advantage of this resource.

roughly $73,000 in checks to Habib during October and November 2013; [6]

(2) Deronceler's presentation of checks of roughly $36,000 in checks to Habib

from October 2013 to early 2014; and (3) Latasha Pharr's presentation of around

$84,000 in checks to Habib from June to October 2014. [7]  The checks presented by

Jean and Deronceler from October 2013 to early 2014 total $109,000.

Pursuant to § 2B1.1 of the 2014 Sentencing Guidelines, the PSR assigned

Jean a base offense level of seven for Count 1.  The PSR also applied these

increases:  (1) a ten-level increase under § 2B1.1(b)(1)(F) because the loss amount

was between $120,000 and $200,000; (2) a two-level increase under

§ 2B1.1(b)(2)(A)(i) because her offense involved ten or more victims; (3) a two-

level increase under § 2B1.1(b)(10)(C) because her offense involved sophisticated

means; and (4) a two-level increase under § 2B1.1(b)(11)(B)(i) because her offense

involved the production of unauthorized access devices.  Jean also received a

three-level decrease for acceptance of responsibility and for timely notifying the

---

[6]The PSR refers to three checks from Jean's "friend Ashley" that Jean presented to Habib to be cashed on October 28, 2013.  The PSR does not state the amount of these checks.  It appears, though, that the amount of the checks attributable to Ashley is included in Jean's personal amount of $73,000.

[7]The PSR reported that in 2013, Pharr began cashing fraudulent or stolen checks at Kwik Stop.  Pharr ceased contact with Habib for a time, but eventually reconnected with Habib in June 2014.  At that time, Pharr told Habib that she no longer dealt with Presendieu because he took her checks and kept the money.

Between June and October 2014, Pharr cashed several checks with Habib, which totaled approximately $84,000. Jean did not object to the fact that Pharr cashed these illicit checks. As recounted later, Jean objected on the grounds that she never met or dealt with Pharr and did not undertake any activity with Pharr.

government of her intention to plead guilty. This resulted in a total offense level of 20.

As to Jean's conviction for conspiracy to commit bank fraud (Count 1), the PSR used her total offense level of 20 and criminal history category of I, yielding an advisory guidelines range of 33 to 41 months. As to her aggravated-identity-theft conviction (Count 35), Jean was subject to a mandatory consecutive sentence of two years' imprisonment.

On October 13, 2015, Jean filed written objections to the PSR, four of which are relevant to this appeal. Jean objected to (1) the calculation of her loss amount, (2) the two-level increase under § 2B1.1(b)(10)(C) for sophisticated means, (3) the two-level increase under § 2B1.1(b)(11)(B)(i) for production of unauthorized access devices, and (4) the lack of a minor role reduction under § 3B1.2(b). As part of her objections, Jean argued that the PSR "should be amended to reflect that Ms. Jean never met nor dealt with either Ms. Pharr or Mr. Miles." Jean also objected to the PSR's use of the 2014 version of the guidelines and contended the 2015 guidelines should be applied as to the loss amount and sophisticated means increases.[8]

---

[8]As to loss amount, Jean expressly asked for the 2015 guidelines to be applied. As to sophisticated means, Jean claimed she "did not intentionally engage in or cause any conduct arguably constituting sophisticated means."

## C.    Sentencing Hearing

On October 29, 2015, the district court held Jean's sentencing hearing, and she raised several objections. First, as to her loss amount objection, Jean contended (1) that she ceased participating in the conspiracy in November 2013; (2) that the Pharr checks totaling $84,000 were cashed from June to October 2014; (3) that Pharr's check-cashing activity thus occurred over eight months after Jean last cashed a check; and (4) that she was unaware of Pharr's existence until everyone was arrested. As such, Jean argued her "relevant conduct" under § 1B1.3 did not include Pharr's criminal activity. That is because Pharr's activities between June and October 2014 were allegedly outside the scope of Jean's criminal activity, were not reasonably foreseeable to Jean, and were not in furtherance of any criminal activity in which Jean jointly participated.

In response, the government argued that it was foreseeable to Jean that Habib would continue cashing illicit checks for other persons after Jean stopped participating in the scheme and, thus, that Jean should be held responsible for the $84,000 in checks cashed by Pharr. The district court overruled Jean's loss amount objection on the grounds that Pharr's activities were within the scope of the conspiracy and "certainly" foreseeable to Jean. Specifically, the district court found that Jean had "said she had a few partners that had tax fraud things going on" and had "actually introduced other people into the conspiracy." The district

30

court determined that the loss amount in the PSR "reflects both the actual losses attributable to [Jean] as well as losses that were reasonably foreseeable."

Second, as to her sophisticated means objection, the district court found that the bank fraud conspiracy involved sophisticated means, including the creation of tax service companies for processing fraudulent tax returns to obtain United States Treasury checks, the theft of Treasury checks from the mail, and the generation of false identification documents so that Habib could and would cash those unlawfully obtained checks. The district court overruled this objection.

Jean asked the district court to apply the 2015 guidelines, effective November 1, 2015, which included an amendment directing the sentencing court to focus more on the individual's own conduct to determine whether the offense involved sophisticated means. The district court declined to apply the 2015 guidelines because Jean's offense "took place over a long period of time, ending more than a year ago" in 2013 and because the 2015 guidelines were not effective until November 1, 2015. Alternatively, the district court found that, even under the 2015 guidelines, Jean's offense "arguably" still satisfied the definition of sophisticated means. The district court stated that "there was an operation here where they had to get false identification documents to mirror what was in the check" and that "Jean was intimately involved with obtaining identifications tailored towards the [recordkeeping] needs [of] Mr. Habib to cash those checks."

31

Third, the district court overruled Jean's objection to the increase for the production of unauthorized access devices. The district court found that Jean had directed and paid an associate to create identification matching the payee information on the checks she intended to cash.

Fourth, the district court denied Jean's minor role request. The district court emphasized that Jean was being held accountable for only those losses directly attributable to her ($193,132.53), while codefendant Presendieu was responsible for a greater overall loss amount ($2,594,839.33). Jean maintained that she was substantially less culpable than the other participants in the scheme, such as Presendieu and Pharr, whose participation extended much further than Jean's because they both ran their own fraudulent tax preparation services. The district court responded that, if Jean were being held accountable for the same overall loss amount as Presendieu, then a minor role reduction would be appropriate. But the district court determined that, because Jean was responsible only for "her own actions as opposed to the broader conspiracy," this fact alone warranted denial of her request for a minor role reduction. As to this sole factor, the district court emphasized that Jean was not being held responsible for the greater loss amount of $2,594,839.33 from the broader conspiracy.

The district court adopted the PSR's guidelines calculations of a total offense level of twenty and a criminal history category of I, resulting in an

32

advisory guidelines range of 33 to 41 months' imprisonment for Count 1. After hearing mitigating evidence, the district court determined that a slight downward variance was appropriate as to Count 1. Ultimately, the district court sentenced Jean to 27 months as to Count 1 and a consecutive 24 months as to Count 35, for a total sentence of 51 months' imprisonment. The district court ordered Jean to pay $73,635.95 in restitution.

## D.    Loss Amount Calculation

On appeal, Jean contends that the district court erred in calculating her loss amount as $193,132.53 because that sum included the $84,000 from Pharr's check-cashing activities in 2014 and because Pharr's conduct was neither within the scope of Jean's jointly undertaken criminal activity nor reasonably foreseeable.[9]

As noted above, the district court applied the 2014 guidelines because Jean's conduct occurred in 2013, Jean was sentenced on October 29, 2015, and the 2015 guidelines were not effective until November 1, 2015. As to the loss amount, § 2B1.1 provides that a defendant receives an eight-level increase if she is responsible for a loss amount exceeding $70,000 and a ten-level increase for a loss amount exceeding $120,000. U.S.S.G. § 2B1.1 (2014). To determine loss amount,

---

[9]We review de novo the district court's interpretation of the sentencing guidelines. United States v. Wright, 607 F.3d 708, 711–12 (11th Cir. 2010). We must accept the district court's findings of fact unless they are clearly erroneous and give due deference to the district court's application of the guidelines to the facts. 18 U.S.C. § 3742(e); United States v. Hesser, 800 F.3d 1310, 1330 (11th Cir. 2015). In particular, we review the district court's calculation of the loss amount for clear error. United States v. Maxwell, 579 F.3d 1282, 1305 (11th Cir. 2009).

we look to the defendant's "relevant conduct." See id. § 1B1.3(a)(1)(B)

(2014). The text of § 1B1.3(a)(1)(B) in the 2014 guidelines provides that the

defendant's relevant conduct includes, in the case of jointly undertaken criminal

activity, "all reasonably foreseeable acts and omissions of others in furtherance of

the jointly undertaken criminal activity." Id. § 1B1.3(a)(1)(B).

The commentary to § 1B1.3 requires the district court to determine first "the

scope of the criminal activity the particular defendant agreed to jointly undertake"

in order to determine the relevant conduct for which a defendant may be held

responsible. U.S.S.G. § 1B1.3 cmt. n.2 (2014). "[T]he scope of the criminal

activity jointly undertaken by the defendant . . . is not necessarily the same as the

scope of the entire conspiracy, and hence relevant conduct is not necessarily the

same for every participant" in the conspiracy. Id. Under the 2014 guidelines,

therefore, it was already clear that, for sentencing purposes, a defendant's relevant

conduct extends only as far as the scope of her jointly undertaken criminal activity.

See id. "Once a district court makes 'individualized findings concerning the scope

of criminal activity undertaken by a particular participant,' it [then] can determine

foreseeability." United States v. Pierre, 825 F.3d 1183, 1198 (11th Cir. 2016)

(quoting United States v. Hunter, 323 F.3d 1314, 1319 (11th Cir. 2003)).

In 2015, the Sentencing Commission amended § 1B1.3(a)(1)(B) to state that,

in the case of a jointly undertaken criminal activity, a defendant is responsible for

"all acts and omissions of others that were—(i) <u>within the scope of the jointly undertaken criminal activity</u>, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity." U.S.S.G. § 1B1.3(a)(1)(B) (2015) (emphasis added). The Sentencing Commission explained that this 2015 amendment was intended to "clarify" § 1B1.3 to delineate more clearly the "jointly undertaken criminal activity" analysis by moving the "scope" portion of that inquiry from the commentary to the main text of § 1B1.3. <u>Id.</u> supp. to app. C, amend. 790 (Reason for Amendment). The Sentencing Commission advised that this amendment was "not intended as a substantive change in policy." <u>Id.</u>

Although substantive changes to the guidelines do not apply retroactively, this Court applies clarifying amendments retroactively on appeal regardless of the sentencing date. <u>United States v. Jerchower</u>, 631 F.3d 1181, 1184 (11th Cir. 2011). Therefore, this 2015 amendment to § 1B1.3 applies to Jean's sentence.

We must first examine the scope of Jean's jointly undertaken criminal activity. Based on the record, we conclude there is no evidence that Pharr's activity from June to October 2014 was within the scope of Jean's jointly undertaken criminal activity. Although Presendieu initially introduced both Jean and Pharr to Habib, Habib later told Jean that he would not work with her if she was still connected to Presendieu. Furthermore, Jean procured her own false

35

identification documents to cash her checks, negotiated her own share of the check proceeds directly with Habib, and addressed on her own any problems Habib had with the false identification she provided. Jean's check cashing with Habib continued through November 2013.

Jean did admit that she brought Deronceler into the conspiracy and that she is responsible for checks cashed by Deronceler and her "friend Ashley." But Jean has consistently asserted that she never met or dealt with Pharr and was unaware of Pharr's existence during her own crimes. There is no evidence of any contact at all between Pharr and Jean or that Jean knew anything about Pharr or Pharr's activity. After Jean's express objection on this point, the government did not present any evidence of any connection or any contact between Jean and Pharr, and Jean's factual proffer also did not connect Jean to Pharr.

Jean's mere awareness that she was part of a larger check-cashing scheme is alone insufficient to show that Pharr's criminal activity was within the scope of Jean's jointly undertaken criminal activity. U.S.S.G. § 1B1.3. Because no evidence supports the determination that Pharr's activity in June to October 2014 was within the scope of Jean's jointly undertaken criminal activity, the district court clearly erred in holding Jean responsible for the approximately $84,000 of loss incurred as a result of Pharr's independent check-cashing activity.

36

As such, we vacate Jean's sentence and remand for resentencing.  At sentencing the parties agreed that, without the amount attributable to Pharr, the loss amount was approximately $109,000, which consisted of the amounts of the checks cashed by Jean herself and Deronceler, whom she brought into the conspiracy.[10]  Therefore, on remand, the district court shall use this $109,000 as the loss amount, recalculate Jean's advisory guidelines range, and resentence Jean.

## E.    Increase for Unauthorized or Counterfeit Access Device

Jean argues that the district court erred in applying a two-level increase under § 2B1.1(b)(11)(B)(i) for the production of counterfeit or unauthorized access devices.  We review the relevant guidelines and then Jean's arguments.[11]

Under § 2B1.1, a defendant's offense level is increased by two if the offense involved "the production or trafficking of any . . . unauthorized access device or counterfeit access device."  U.S.S.G. § 2B1.1(b)(11)(B)(i) (2014).  The term "access device" includes "any card, . . . account number, . . . personal identification number, . . . or other means of account access that can be used . . . to obtain money, goods, services, or any other thing of value."  18 U.S.C. § 1029(e)(1).  The parties

---

[10]As noted earlier, the checks attributable to Jean's "friend Ashley" were included in Jean's personal amount of $73,000, whereas Deronceler's checks were appropriately added to Jean's total loss amount.

[11]We review for clear error the district court's factual determinations as to whether the defendant induced or willfully caused the production of an unauthorized access device. See United States v. Taylor, 818 F.3d 671, 673, 680 (11th Cir. 2016), cert. denied, __ U.S. __, 137 S. Ct. 387 (2016) (mem.).

37

agree that Jean used unauthorized or counterfeit access devices, such as personal identification cards, in the course of her offense conduct of obtaining money. The parties dispute whether Jean was involved in the production of such access devices.

When a defendant, such as Jean, is separately convicted of aggravated identity theft under 18 U.S.C. § 1028A, the application of the two-level increase for production of such access devices under § 2B1.1(b)(11)(B)(i) is limited. Pursuant to § 2B1.6 of the guidelines, where the defendant is separately convicted under 18 U.S.C. § 1028A, the two-level increase under § 2B1.1 does not apply when the defendant's conduct is limited to the mere "transfer, possession, or use of a means of identification." U.S.S.G. § 2B1.6 cmt. n.2 (2014). As this Court has recognized, "[t]his [§ 2B1.6] limitation is particularly relevant to § 2B1.1 because 'means of identification' may include access devices.'" United States v. Taylor, 818 F.3d 671, 675 (11th Cir.), cert denied, __ U.S. __, 137 S. Ct. 387 (2016) (mem.). The § 2B1.6 limitation is intended to prevent a defendant who is separately convicted of aggravated identity theft from being "doubly penalized" for the same conduct. Id.

Notwithstanding the § 2B1.6 limitation, a defendant who is separately convicted of aggravated identity theft can still receive the two-level increase under § 2B1.1(b)(11)(B)(i) if her offense conduct involved the production of an unauthorized or counterfeit access device. Id. at 676. As construed by this Court,

38

"production" encompasses a broad range of conduct, including where the defendant "<u>willfully causes</u> the 'manufacture, design, alteration, authentication, duplication, or assembly' of an unauthorized access device." <u>Id.</u> at 679 (quoting U.S.S.G. § 2B1.1 cmt n.10(A). It follows that "the production enhancement is applicable to conduct involving third-party production—whether physically performed by a criminal co-conspirator or by an innocent party—that has been <u>willfully induced</u> by the defendant." <u>Id.</u> (emphasis added). Thus, if Jean's conduct involved the production of personal identification cards, then the district court correctly applied this two-level increase under § 2B1.1(b)(11)(B)(i).

As established in her factual proffer, Jean's conduct did involve the production of false identification cards, and so we conclude that the district court did not err in applying this two-level increase. For certain checks listed in the proffer, Jean provided to Habib counterfeit identification cards matching the named payee. For other checks, Jean assured Habib that she would provide "the right information for the checks and correct identification." Jean also used social security numbers and assured Habib that the social security numbers she used were accurate. Jean admitted she "pays people for checks and identification."

In the proffer, Jean discussed at least twice "her source for identification documents." Jean admitted she had "an ID guy who gets ID's to her so that nothing can be traced." Jean also admitted her ID guy had returned to Pakistan,

39

but stated that she would bring the correct identification for checks.  When Habib

remarked that the picture on one of the identification cards had been used before,

Jean responded that "she [did] not think her ID people" would use a duplicate

photo because "it would be dumb."  The evidence amply shows that Jean willfully

procured, induced, and caused the manufacture, duplication, or assembly of

counterfeit identification cards that matched the payees on her checks.  See Taylor,

818 F.3d at 679.

We conclude the district court did not err in applying the two-level increase

under § 2B1.1(b)(11)(B)(i).

## F.    Sophisticated Means Increase

Jean also challenges the district court's application of a two-level increase

under § 2B1.1(b)(10)(C) for the use of sophisticated means.[12]

Under the 2014 guidelines, a defendant receives a two-level increase if,

among other things, the offense "involved sophisticated means."  U.S.S.G.

§ 2B1.1(b)(10)(C) (2014).  The guidelines provide that each action by the

defendant need not be sophisticated in order to support the two-level increase, so

long as the "totality of the scheme was sophisticated."  Barrington, 648 F.3d at

1199.  The commentary to § 2B1.1 defines "sophisticated means" as "especially

---

[12]The district court's finding that sophisticated means were used is a finding of fact that is
reviewed for clear error.  Barrington, 648 F.3d at 1199.

complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." Id. § 2B1.1 cmt. n.9(B) (2014). Examples of sophisticated means listed in the commentary include "hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts." Id.

Jean contends that Amendment 792 to § 2B1.1(b)(10)(C), which became effective on November 1, 2015, three days after her sentencing hearing, should apply to her sentence. Amendment 792 provides that the two-level increase applies if the offense "involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means." U.S.S.G. § 2B1.1(b)(10)(C) (2015) (emphasis added). This latter phrase was added to the text of the guideline.

However, Amendment 792 does not apply to Jean's case because it is a substantive amendment. Jerchower, 631 F.3d at 1184 (holding that only clarifying amendments apply retroactively). First, the amendment added a new requirement to the text of the guidelines that was not previously in either the commentary or the guidelines. See U.S.S.G. supp. to app. C, amend. 792. Second, the commentary acknowledges that Amendment 792 "narrow[ed]" the scope of the offense characteristic. U.S.S.G. supp. to app. C, amend. 792 (Reason for Amendment). Third, the amendment does not appear in the list of amendments made retroactive

41

in § 1B1.10(d).  Id. § 1B1.10(d) (2015).  Fourth, the amendment overturns circuit

precedent that "had applied this enhancement on the basis of the sophistication of

the overall scheme without a determination of whether the defendant's own

conduct was 'sophisticated,'" U.S.S.G. supp. to app. C, amend. 792 (Reason for

Amendment), which also suggests a substantive change, see Jerchower, 631 F.3d at

1185.

Here, applying the 2014 guidelines, we conclude that the record supports the

district court's finding that Jean's offense involved sophisticated means.  As

admitted in the factual proffer, Jean herself employed intricate measures to execute

and then conceal her bank fraud.  Jean unlawfully procured checks payable to

others and acquired false identification cards tailored to each check to satisfy

Habib's documentation requirements.  Jean assured Habib that the fraudulent

identification she provided was untraceable.  Furthermore, Jean procured these

illicit checks from tax return companies organized for the purpose of filing

fraudulent tax returns.  In the factual proffer, Jean admitted telling Habib that she

had a few partners engaged in tax fraud, that "she gets mainly government checks

and gets cashier's checks around tax season time," that she "does $20-30,000 every

week" in checks, and that she expected to have "a load of checks to cash" in

December and January from a "tax season company."  Jean also indicated to Habib

that she could ensure that the identification information she provided to accompany

her checks was accurate.

On the record before it, the district court did not clearly err in finding that

Jean's offense involved sophisticated means and in imposing the two-level

increase under § 2B1.1(b)(10)(C).

## G.    Minor Role Reduction

Jean also argues that the district court erred in denying her request for a

minor role reduction under § 3B1.2(b).[13]

Section 3B1.2 provides for a two-level reduction in the offense level where

the defendant was a "minor participant" in the criminal activity.  U.S.S.G.

§ 3B1.2(b) (2014).  A minor participant is a one "who is less culpable than most

other participants, but whose role could not be described as minimal."  Id.

§ 3B1.2(b) cmt. n.5 (2014).  Whether a defendant is entitled to a minor role

reduction is "based on the totality of the circumstances and involves a

determination that is heavily dependent upon the facts of the particular case."  Id.

§ 3B1.2(b) cmt. n.3(C).

Two principles guide the determination of whether a defendant played a

minor role in the criminal scheme:  (1) "the defendant's role in the relevant

---

[13]As to the extent of the defendant's role in the offense, we also review for clear error.
United States v. De Varon, 175 F.3d 930, 937 (11th Cir. 1999) (en banc).

conduct for which she has been held accountable at sentencing," and (2) "her role as compared to that of other participants in her relevant conduct." United States v. De Varon, 175 F.3d 930, 940 (11th Cir 1999) (en banc). The en banc Court in De Varon emphasized the fact-intensive nature of this inquiry, stressing the importance of considering a number of factors relevant to the particular criminal scheme at issue. Id. at 943–45. The proponent of the minor role reduction—here, Jean—bears the burden of proving that she played a minor role by a preponderance of the evidence. Id. at 939.

In 2015, the Sentencing Commission amended § 3B1.2's commentary to provide additional guidance regarding the minor role reduction. See U.S.S.G. supp. to app. C, amend. 794 (Reason for Amendment). This Court has already held that Amendment 794 is a clarifying amendment, did not substantively change § 3B1.2, and thus can be considered regardless of a defendant's sentencing date. See United States v. Cruickshank, 837 F.3d 1182, 1194 (11th Cir. 2016), cert. denied, __ U.S. __, 137 S. Ct. 1435 (2017) (mem.).

Similar to the fact-intensive, multi-faceted approach this Court established in De Varon, Amendment 794 provides a non-exhaustive list of factors to be considered when determining whether a defendant qualifies for a minor role reduction: (1) "the degree to which the defendant understood the scope and structure of the criminal activity;" (2) "the degree to which the defendant

44

participated in planning or organizing the criminal activity;" (3) "the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority;" (4) "the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts;" and (5) "the degree to which the defendant stood to benefit from the criminal activity."  U.S.S.G. § 3B1.2  cmt. n.3(C) (2015).

Our recent decision in Cruickshank is instructive here because it explained the legal error in making a minor role decision based solely on one factor.  In Cruickshank, the defendant was convicted of transporting a large amount of cocaine aboard a seafaring vessel. 837 F.3d at 1186–87.  The district court suggested that the amount of drugs at issue was so large that no participant in the scheme could be eligible for a minor role reduction.  Id. at 1194–95.

In vacating the defendant's sentence in Cruickshank, the Court stated that, although neither De Varon nor Amendment 794 precluded the district court from considering the overall amount of drugs to determine the magnitude of the defendant's role, it was legal error for the district court "to say that this is the only factor to be considered in a case like this one."  Id. at 1195.  This Court directed the district court on remand to consider the defendant's role in the scheme "based

45

on the totality of circumstances, taking into account the variety of factors laid out in <u>De Varon</u> and Amendment 794." <u>Id.</u>

Similarly, here the district court indicated that Jean was not entitled to a minor role reduction solely on the ground that she was being held accountable only for "her own actions as opposed to the broader conspiracy." While that is not an impermissible factor, it is only one of many relevant factors. And, there is conflicting evidence regarding the scope of Jean's role as compared with the other participants in this criminal scheme. On the one hand, Jean described herself as a boss with independent access to unlawful checks and false identification cards and negotiated her own share of the illicit checks she cashed with Habib. On the other hand, unlike Presendieu and Pharr, who actually formed and operated their own tax return companies, Jean claimed that she paid others for her checks and told Habib that Deronceler was in fact her boss. The evidence is simply conflicting as to Jean's role, requiring some fact findings.

On remand, the district court should examine Jean's role in the overall scheme in light of the relevant factors and the totality of the circumstances. This Court's decision is not a determination as to Jean's ultimate entitlement to a minor role adjustment, but rather only a direction to the district court to make the requisite factual findings in regard to the other relevant factors beyond loss amount.

46

## IV. CONCLUSION

We affirm Presendieu's convictions.  As to Jean's sentence, we conclude that the district court did not err in applying the offense level increases for sophisticated means under § 2B1.1(b)(10)(C) and for production of unauthorized or counterfeit access devices under § 2B1.1(b)(11)(B)(i).  The district court did err, however, in determining the loss amount under § 1B1.3 and in making its minor role decision based solely on one factor.  On remand the district court shall use a loss amount of $109,000, examine Jean's role in the scheme in light of the relevant factors and the totality of the circumstances, and resentence Jean.

**AFFIRMED IN PART, VACATED IN PART, AND REMANDED.**

47

JORDAN, Circuit Judge, concurring.

I join Parts I, III, and IV of the court's opinion, and concur in the judgment with respect to Part II.

As to Part II, I agree with the court that, on this record and under our precedent, Mr. Presendieu has not established plain error resulting from the district court's failure to explain the elements of the bank fraud and aggravated identity theft offenses at the change of plea hearing. But in my view, there is seldom a good reason for a district court to fail to set out the elements of an offense during a Rule 11 plea colloquy.

For a long time, guilty pleas have dwarfed trials in the federal criminal system. In Fiscal Year 2016, which ended in September of 2016, there were 67,742 criminal cases in the federal courts of the United States, and a whopping 97.3% of the defendants in those cases chose to plead guilty instead of exercising their right to trial. *See* United States Sentencing Commission, Overview of Federal Criminal Cases: Fiscal Year 2016, at 1, 5 (May 2017). So, although a Rule 11 colloquy—which substitutes for trial in so many cases—may not be the most exciting task that district courts are charged with, it is undoubtedly one of the most important.

To those of us in the legal profession (and particularly those who have worked in the field of criminal law), characterizing an offense as "simple" or

48

"complex" for purposes of Rule 11 may be thought of as relatively straightforward. I suggest, however, that for a defendant who is foregoing his or her right to trial by pleading guilty, there is no such thing as a "simple" offense.

In order to properly decide whether to enter a guilty plea, with or without a plea agreement, a defendant needs to know, or at least understand, many things. Among these are the elements of the offense to which he is pleading guilty. Only by knowing what the government has to prove at trial can a defendant make sense of the relationship between law and fact, i.e., understand the nature of the charge, *see* Fed. R. Civ. P. 11(b)(1)(G), and knowingly decide whether a guilty plea is the best option. As we have said, a "defendant does not receive 'real notice' of the nature of the charge against him unless he is informed of the elements of the charged offense." *United States v. Brown*, 117 F.3d 471, 476 (11th Cir. 1997). Not surprisingly, the benchbook prepared by the Federal Judicial Center provides that during a Rule 11 plea colloquy the district court should, after summarizing the charges, "further explain the essential elements of the offense, i.e., what the government would be required to prove a trial." Federal Judicial Center, Benchbook for U.S. District Judges § O.1 (4th ed. March 2013).

Unlike the court, I am not sure that aggravated identify theft, *see* 18 U.S.C. § 1028A, is an offense whose elements are apparent to the uninitiated. For example, it is not enough for a defendant to have transferred, possessed, or used the means

49

of identification of another person. Such conduct must also have been "during and in relation to" a predicate felony identified in the statute, and it is not self-evident which felonies Congress chose to make predicates for the crime of aggravated identity theft. Mr. Presendieu, and the system we are charged with administering, would have been better served with an explanation of the elements of aggravated identity theft. Nevertheless, the court is correct that Mr. Presendieu has not established plain error, *see, e.g., United States v. Moriarty*, 429 F.3d 1012, 1018-20 (11th Cir. 2005), and I therefore concur in its judgment on his claim.