RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 17a0198p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

No. 16-2208

ANTONIO P. FONTANA,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:14-cr-20141-1—David M. Lawson, District Judge.

Decided and Filed:  August 25, 2017

Before: ROGERS, GRIFFIN, and KETHLEDGE, Circuit Judges.

_____

## COUNSEL

**ON BRIEF:**  Kenneth P. Tableman, KENNETH P. TABLEMAN, P.C., Grand Rapids, Michigan, for Appellant.  Shane Cralle, UNITED STATES ATTORNEY'S OFFICE, Detroit, Michigan, for Appellee.

_____

## OPINION

_____

ROGERS, Circuit Judge.  Following extradition from Canada on twelve federal child-pornography-related charges, defendant Fontana pleaded guilty to four of those charges.  He was then sentenced in a proceeding in which the sentencing judge took into account, in applying the applicable sentencing factors under 18 U.S.C. § 3553(a), the fact that after Fontana's arrest, investigators discovered videos and images of up to fifty other women, including minors, whom

he had also victimized, none of whom were the basis for Fontana's extradition.  On appeal, Fontana challenges the district court's consideration of the additional victims, as he did below, as a violation of the U.S.-Canada extradition treaty's "specialty" requirement that he only be detained, tried, or punished for the crimes for which he was extradited.  While an extradited person may defend his criminal prosecution as beyond the scope of the extradition under the "specialty" theory, Fontana's challenge to his sentence fails here because the treaty does not preclude taking into account activity that is not the basis of the extradition in determining punishment for the crimes on which the extradition *was* based, at least as long as such consideration did not affect the statutory range of that punishment.

In October 2013, Antonio Fontana lived in Pickering, Ontario.  He was in his late 50s, married, with adult children.  On the chat website Omegle.com, Fontana posed as a sixteen-year-old boy named "Jason," and started talking with a fifteen-year-old minor female living in suburban Detroit ("Minor Victim One").  Fontana claimed that his computer's camera was broken—so that Minor Victim One could not discern his age—and convinced his victim to take off her shirt.  Without the victim's knowledge, he recorded this act, and then used the threat of publishing this recording online to take over her life.  He forced her to perform more, increasingly invasive sexual acts, which he recorded and used as additional leverage.  He forced her to be in front of her web camera at certain times, to sleep in a certain position so that she was visible to the web camera, and to ask for permission to attend social events.  He forced her to convince a friend—a fourteen-year-old female ("Minor Victim Two")—to perform sexual acts for him as well, which he also recorded and then began using to threaten the friend as well.  Eventually, Minor Victim One began to suffer from severe depression and tried to cut off contact.  In response, Fontana e-mailed Minor Victim One's mother the explicit photos he had taken of her daughter and demanded that his victim get back in touch with him.  After this threat was unsuccessful, Fontana e-mailed more explicit photos to the principal of Minor Victim One's school and over eighty members of her church.  The mother called the police, who were able to uncover Fontana's true identity through the Internet.

Ontario police arrested Fontana on February 23, 2014.  By chance, at the time of his arrest, Fontana was online trying to coerce another minor female into performing sexual acts for

him.  Fontana was detained in Canada pending extradition.  In March 2014, a U.S. grand jury indicted Fontana on twelve counts arising out of his conduct towards Minor Victim One and Minor Victim Two.  In June 2015, the Canadian government surrendered Fontana to the United States to stand trial for these crimes, pursuant to the extradition treaty between the two countries.  *See* Treaty on Extradition between the United States of America and Canada, Can.-U.S., 27 UST 983, Dec. 3, 1971 ("U.S.-Can. Extradition Treaty").  During the indictment and extradition process, investigators seized and analyzed Fontana's computer.  The computer was found to have over 1,000 images and multiple videos of additional women and girls, from which investigators determined that Fontana had engaged in similar conduct with at least fifty victims.  At the time of Fontana's sentencing, only a handful of these uncharged victims had been identified, but all were minors, and most lived in the United States.

Once in the United States, Fontana pleaded guilty to four of the twelve counts for which he had been indicted: one count of coercing and enticing a minor to engage in illegal sexual activity, in violation of 18 U.S.C. § 2422(b); one count of producing child pornography, in violation of 18 U.S.C. § 2251(a); and two counts of using the internet to extort a person, in violation of 18 U.S.C. § 875(d).

During sentencing, however, the issue arose as to whether to take into account Fontana's other, uncharged victims.  Even without consideration of his uncharged victims, Fontana's net offense level was above the maximum possible under the Sentencing Guidelines, such that the guidelines recommended incarceration for life.  Nevertheless, the Government argued that the district court should consider the uncharged victims under the 18 U.S.C § 3553(a) factors, apparently in response to Fontana's request for a downward variance outside his Guidelines range.

Fontana objected, arguing that the district court's consideration of the uncharged victims violated a provision of the U.S.-Canada extradition treaty providing that: "[a] person extradited under the present treaty shall not be detained, tried or *punished* in the territory of the requesting state for an offense other than that for which extradition has been granted." U.S.-Can. Extradition Treaty art. 12(1) (emphasis added).  This provision of the treaty incorporates what is known as the rule of specialty, which provides that "a person who has been brought within the jurisdiction

of the court by virtue of proceedings under an extradition treaty, can only be tried for one of the offences described in that treaty, and for the offence with which he is charged in the proceedings for his extradition." *United States v. Rauscher*, 119 U.S. 407, 430 (1886).

The district court, however, overruled Fontana's objection and held that it could consider his uncharged victims in sentencing him.  In reaching this conclusion, the district court relied primarily on an Eighth Circuit case, *United States v. Lomeli*, 596 F.3d 496, 502–03 (8th Cir. 2010), which applied an extradition treaty with Mexico which, like the extradition treaty with Canada at issue in Fontana's case, held that an extradited person could not be "detained, tried or *punished*" for a separate crime.  In particular, the district court found persuasive *Lomeli*'s reasoning that the traditions and procedures of the receiving nation's courts were relevant for determining the intent of the treaty parties in drafting the extradition treaty, and that "[g]iven the long-standing practice of United States courts of considering relevant, uncharged evidence at sentencing," *Lomeli*, 596 F.3d at 502 (quotation marks omitted), it would be difficult to conclude that Mexico did not intend for an extradited defendant to face sentencing enhancements for uncharged crimes.  The district court also considered this circuit's prior precedent in *United States v. Garrido-Santana*, 360 F.3d 565, 578 (6th Cir. 2004), but ultimately suggested that the case might be distinguishable based on the different treaty language: the U.S.-Dominican Republic treaty provision in *Garrido-Santana* held only that "no [extradited] person shall be *tried*" for a separate offense, while the U.S.-Canada treaty at issue in Fontana's case held that "[a] person extradited . . . shall not be detained, tried, or *punished*."  After concluding that consideration of Fontana's uncharged victims would not violate the rule of specialty, the court presumably considered these victims in Fontana's sentence.  Nevertheless, the court did grant Fontana a downward variance and sentenced him to 360 months' incarceration rather than the guidelines recommendation of life.  Fontana now appeals.

The district court did not violate the rule of specialty by considering Fontana's other victims in sentencing for the crimes for which he was extradited.

As an initial matter, we reject the Government's suggestion that Fontana lacks standing to make objections to his criminal prosecution on the basis of the treaty provisions incorporating the doctrine of specialty.  The seminal case involving the specialty doctrine, the Supreme Court's

case of *United States v. Rauscher*, 119 U.S. 407 (1886), is flatly inconsistent with such a conclusion.  In *Rauscher*, Great Britain surrendered a sailor to the United States pursuant to an extradition treaty with a specialty provision, so that the sailor could stand trial for murder on the high seas.  *Id.* at 409.  Once in the United States, however, the sailor was indicted not for murder, but for the separate crime of "cruel and unusual punishment."  *Id.*  In response, the defendant brought a plea to the jurisdiction of the court, arguing that he could not be indicted for cruel and unusual punishment when he had been extradited for murder.  *Id.*  The trial court overruled the defendant's plea, but the Supreme Court held that this was error, articulating the rule that "a person who has been brought within the jurisdiction of the court, by virtue of proceedings under an extradition treaty, can only be tried for one of the offences described in that treaty."  *Id.* at 430.

While *Rauscher* is an old case, it was described with approval in *United States v. Alvarez-Machain*, 504 U.S. 655, 659–60 (1992), and it is still good law: an extradited criminal defendant may not be tried for crimes not the basis for extradition, absent waiver by the treaty partner, when such is the intent of the treaty, and relief under such a treaty obligation can be obtained at the behest of counsel for the defendant in the criminal proceeding.  This conclusion is supported by holdings of at least four of our sister circuits.  *See United States v. Puentes*, 50 F.3d 1567, 1572 (11th Cir. 1995); *United States v. Andonian*, 29 F.3d 1432, 1435 (9th Cir. 1994); *United States v. Levy*, 905 F.2d 326, 328 n.1 (10th Cir. 1990); *United States v. Thirion*, 813 F.2d 146, 151 n.5 (8th Cir. 1987).

The Eleventh Circuit's reasoning in *Puentes* is particularly compelling:

Of course, the rights conferred under the contract ultimately belong to the contracting parties, the signatory nations.  This does not mean, however, that provisions of the contract may not confer certain rights under the contract on a non-party who is the object of the contract.  *See generally Rauscher.*  We believe that *Rauscher* clearly confers such a right on the extradited defendant.  The extradited individual's rights, however, need not be cast in stone; rather, the individual may enjoy these protections only at the sufferance of the requested nation.  The individual's rights are derivative of the rights of the requested nation.  We believe that *Rauscher* demonstrates that even in the absence of a protest from the requested state, an individual extradited pursuant to a treaty has standing to challenge the court's personal jurisdiction under the rule of specialty.  The courts which have adopted the contrary holding, in effect, consider the requested state's

objection to be a condition precedent to the individual's ability to raise the claim. We believe the Supreme Court's recent opinion in *United States v. Alvarez-Machain*, 504 U.S. 655, 112 S. Ct. 2188, 119 L. Ed. 2d 441 (1992) seriously undermines any vitality that approach may have once possessed.

A grand jury indicted Humberto Alvarez-Machain, a citizen and resident of Mexico, for participating in the kidnap and murder of United States Drug Enforcement Administration (DEA) special agent Enrique Camarena-Salazar. Following unsuccessful informal negotiations between the United States and Mexico to obtain Alvarez-Machain's presence in this country, DEA successfully contracted with certain individuals for Alvarez-Machain's forcible kidnap and delivery to the United States. Alvarez-Machain contested the district court's personal jurisdiction over him on the grounds that his abduction violated the extradition treaty between the United States and Mexico. The district court granted his request and ordered his return to Mexico. The court of appeals affirmed the district court. The Supreme Court reversed.

The actual holding of the case is that Alvarez-Machain could not contest the court's jurisdiction over him under the extradition treaty because he was not extradited pursuant to treaty proceedings. *See Ker v. Illinois,* 119 U.S. 436, 7 S. Ct. 225, 30 L. Ed. 421 (1886). The Court's analysis, however, rejects the premise underlying the cases that require the requested nation to object as a condition precedent to the individual's ability to claim the benefits of the rule of specialty.

In *Alvarez-Machain,* the Court rejected the Court of Appeals's reasoning that found that the extradition treaty prohibited forcible abduction, but that the abducted individual could only raise the issue if the offended government had formally protested. In rejecting the notion of conditionally self-executing treaty provisions, the Court explained that "if the [e]xtradition [t]reaty has the force of law . . . it would appear that a court must enforce it on behalf of an individual *regardless of the offensiveness of the practice of one nation to the other nation.*" *Alvarez-Machain,* 504 U.S. at 667, 112 S. Ct. at 2195–96, 119 L. Ed. 2d at 454 (emphasis added). Importantly, the Court cited *Rauscher* in support of this proposition:

> In *Rauscher,* the Court noted that Great Britain had taken the position in other cases that the Webster-Ashburton Treaty included the doctrine of specialty, *but no importance was attached to whether or not Great Britain had protested the prosecution of Rauscher for the crime of cruel and unusual punishment as opposed to murder.*

*Alvarez-Machain,* 504 U.S. at 667, 112 S. Ct. at 2195, 119 L. Ed. 2d at 454 (emphasis added). *Alvarez-Machain* demonstrates the infirmity in the reasoning of those cases which require an affirmative protest by the requested nation in order for the extradited individual to contest personal jurisdiction under the rule of specialty.

We, therefore, hold that an individual extradited pursuant to an extradition treaty has standing under the doctrine of specialty to raise any objections which the requested nation might have asserted. The extradited individual, however, enjoys this right at the sufferance of the requested nation. As a sovereign, the requested nation may waive its right to object to a treaty violation and thereby deny the defendant standing to object to such an action.

*Puentes*, 50 F.3d at 1574–75 (footnote omitted). This analysis is correct.

To be sure, a Third Circuit case, on the other hand, has stated that "[h]ad [the habeas petitioner] brought suit invoking . . . the Rule of Specialty, she would lack standing." *United States ex rel. Saroop v. Garcia*, 109 F.3d 165, 168 (3d Cir. 1997). This was pure dictum, as the court made clear that the petitioner in that case did not invoke the specialty principle. *Id.* at n.6. Cases cited by the *Saroop* court in this connection moreover involved foreign government *consent* to limit the international specialty obligation, *e.g.*, *United States v. Riviere*, 924 F.2d 1289, 1298–1301 (3d Cir. 1991), *Leighnor v. Turner*, 884 F.2d 385, 390 (8th Cir. 1989), or did not involve the principle of specialty at all.

Two other cases sometimes cited for the presence of a circuit split on the issue involved extradition proceedings in the United States and assertions that a foreign state might not comply with its specialty obligations to the United States, not whether a defendant who had been extradited to the United States—like Rauscher and Fontana—can rely on United States obligations under the specialty principle. *Shapiro v. Ferrandina*, 478 F.2d 894, 906 (2d Cir. 1973); *Demjanjuk v. Petrovsky*, 776 F.2d 571, 584 (6th Cir. 1985), *vacated on other grounds*, 10 F.3d 338 (6th Cir. 1993). *Shapiro*, for instance, noted that *Rauscher* need not necessarily apply in that "converse situation." 478 F.2d at 906. Similarly, our decision in *Demjanjuk* also involved such a converse situation and included language regarding specialty which was in any event clearly dictum. 776 F.2d at 584.

The Government's brief in this case appears to be fishing for a holding that the principle of specialty cannot be raised by criminal defendants, without actually making the argument for our consideration, and without instilling any confidence that the Government would defend such a holding should certiorari be granted. The Government moreover points to no court of appeals that squarely holds that criminal defendants in the United States are without standing to assert

the specialty principle. With such a wispy basis for deciding contrary to iconic Supreme Court precedent, there is no reason for this court to continue to preserve the possibility of such an argument.

Accordingly, we proceed to the merits of Fontana's specialty argument. His argument fails because Fontana is being "punished" quite literally for crimes for which he was extradited. The fact that other crimes he has committed may affect the extent of the punishment for the extradition-based crimes does not in ordinary English mean that he is being punished for the other crimes.

This conclusion is supported by our decision in *United States v. Garrido-Santana*, 360 F.3d 565, 578 (6th Cir. 2004). In *Garrido-Santana*, the Dominican Republic surrendered a defendant for possession of cocaine with intent to distribute. *Id.* at 568. After the extradition, the defendant was also indicted on a charge arising out of his failure to appear at a pre-extradition arraignment, but this charge was later dropped because it was not an offense for which the defendant had been extradited. *Id.* at 568, 577. Nevertheless, the district court relied on this failure to appear at his arraignment to enhance the defendant's Guidelines calculation, which was the basis of the defendant's specialty challenge. *Id.* at 568. Garrido claimed that his sentencing enhancement for an uncharged failure-to-appear offense violated the relevant extradition treaty's "implicit promise that [the United States] would . . . not punish [the] defendant for the failure-to-appear offense." *Id.* at 577. However, we determined that the district court's use of the uncharged offense "did not constitute 'punishment' for that conduct so as to violate any implicit proscription against such punishment in the extradition treaty." *Id.* at 578. In reaching this determination, we relied in part on *Witte v. United States*, in which the Supreme Court held "that use of evidence of related criminal conduct to enhance a defendant's sentence for a separate crime within the authorized statutory limits does not constitute punishment for that conduct within the meaning of the Double Jeopardy Clause." *See id.* at 577–78 (citing *Witte v. United States*, 515 U.S. 389, 399 (1995)). While we recognized that *Witte* was a double jeopardy case, we noted that "its underlying analytical foundation and, in particular, its conception of 'punishment' is nevertheless instructive." *Id.* at 578. Applying this reasoning and holding from *Garrido-Santana*, it is clear that the district court's consideration of Fontana's

uncharged but related conduct did not constitute "punish[ment]" within the meaning of the U.S.-Canada extradition treaty, but only an appropriate consideration in determining the sentence for the crimes for which Fontana was properly extradited. Therefore, as in *Garrido-Santana*, the consideration of Fontana's uncharged victims in determining his sentence does not violate the rule of specialty.

Also relevant here is the Eighth Circuit's analysis of similar questions of punishment and sentencing in *Lomeli*, 596 F.3d at 503, and *Leighnor*, 884 F.2d at 390. As the district court noted, the *Lomeli* court reasoned that a sentencing enhancement for uncharged crimes did not violate the rule of specialty in that case because traditions and procedures of the receiving nation's courts were relevant for determining the intent of the treaty parties in drafting the extradition treaty, and that "[g]iven the long-standing practice of United States courts of considering relevant, uncharged evidence at sentencing," *Lomeli*, 596 F.3d at 502 (quotation marks omitted), it would be difficult to conclude that Mexico did not intend for an extradited defendant to face sentencing enhancements for uncharged crimes. Similarly, the *Leighnor* court reasoned that "the specialty principle generally prohibits indiscriminate prosecution by the receiving government," such that specialty was not violated when the United States convicted a defendant for only the crimes that were the subject of his indictment but took into account other conduct in making parole decisions. *Leighnor*, 884 F.2d at 390 (quotation marks and emphasis omitted). The analysis in both cases is correct.

Fontana makes two arguments to resist this conclusion, but neither is persuasive.

First, Fontana argues that this court should not follow *Garrido-Santana* because *Witte*, the Supreme Court case upon which it relied, was limited by subsequent Supreme Court decisions. Fontana points to two cases in particular that affected courts' consideration of uncharged facts to enhance a sentence: *Apprendi v. New Jersey*, 530 U.S. 466 (2000) and *Alleyne v. United States*, 133 S. Ct. 2151 (2013). In *Apprendi*, the Court held that a jury must find beyond a reasonable doubt a fact that increases the penalty for a crime beyond the statutory maximum. 530 U.S. at 490. Similarly, in *Alleyne v. United States*, the court held that a jury must find beyond a reasonable doubt any fact that triggers a statutory mandatory minimum sentence. 133 S. Ct. at 2158. Fontana also points to two cases that affected the Guidelines:

*United States v. Booker*, 543 U.S. 220, 245 (2005) and *Peugh v. United States*, 133 S. Ct. 2072, 2078 (2012). *Booker* rendered the Guidelines advisory rather than mandatory, 543 U.S. at 245; *Peugh* held that an ex post facto violation occurs "when a defendant is sentenced under Guidelines promulgated after he committed his criminal acts and the new version provides a higher applicable Guidelines sentencing range than the version in place at the time of the offense," 133 S. Ct. at 2078.

Contrary to Fontana's argument, none of the cases he cites affects the reasoning from *Witte* upon which *Garrido-Santana* relied. *Witte* held that using related criminal conduct to enhance a defendant's sentence "*within the authorized statutory limits*" does not constitute "punishment" for double jeopardy purposes. 515 U.S. at 399 (emphasis added). Fontana's sentence was within the authorized statutory limits for his crimes; in fact, his sentence of 360 months in prison was below his guidelines range of life. This alone means that neither *Apprendi* nor *Alleyne* affects the relevance of *Witte*'s reasoning as applied to Fontana's case via *Garrido-Santana*. *Booker* and *Peugh* are even less on point.

Fontana also seeks to distinguish the treaty provision at issue in *Garrido-Santana* from the one in his case. In *Garrido-Santana*, we considered a provision from the U.S.-Dominican Republic extradition treaty holding that "[n]o person shall be *tried* for any crime or offence other than that for which he was surrendered." 360 F.3d at 577 (citing Convention for the Mutual Extradition of Fugitives from Justice, U.S-Dom. Rep., June 19, 1909, 36 Stat. 2468). Here, the relevant provision from the U.S.-Canada extradition treaty holds that "[a] person extradited under the present treaty shall not be detained, tried or *punished* in the territory of the requesting state for an offense other than that for which extradition has been granted." U.S.-Can. Extradition Treaty art. 12(1) (emphasis added). According to Fontana, the language in these treaties makes them distinguishable, because the U.S.-Dominican Republic treaty "lacked an express agreement not to punish the defendant for conduct other than the conduct for which he was extradited."

However, the reasoning of *Garrido-Santana* forecloses this argument. Although the extradition treaty in *Garrido-Santana* did not contain the word "punishment," the court assumed without deciding that the treaty did contain an "implicit promise" not to punish the extradited

individual for his uncharged crimes. 360 F.3d at 577. We still concluded that the district court's consideration of the defendant's uncharged crime did not constitute "punishment" under the treaty. *Id.* Fontana thus cannot distinguish *Garrido-Santana*, because it addressed the very issue he raises. Furthermore, as noted above, we also find persuasive the Eighth Circuit's analysis in *Lomeli*, which considered an extradition treaty that does contain the punishment language at issue here, but nevertheless concluded that the doctrine of specialty does not prohibit a district court from considering a defendant's criminal history to determine his advisory Sentencing Guidelines range. *See Lomeli*, 596 F.3d at 503.

Finally, Fontana moves to file a supplemental pro se brief arguing that his conviction should be reversed and remanded to allow him to present a defense to the jury that one of the victims told him that she was nineteen years old, which he alleges he reasonably believed. We deny Fontana's motion. A defendant must present a single brief, not two. Fed. R. App. P. 31(a); *United States v. Montgomery*, 592 F. App'x 411, 415 (6th Cir. 2014). This means that we may properly decline to consider pro se claims brought by a defendant represented by counsel on appeal. *United States v. Williams*, 641 F.3d 758, 770 (6th Cir. 2011). There are no circumstances justifying consideration of Fontana's supplemental brief here. Among other things, Fontana's reasonable-mistake-of-age defense attacks his conviction and not his sentence, and he unequivocally waived "any right to appeal his conviction" in his plea agreement. Such a waiver is enforceable so long as it was made knowingly and voluntarily, *United States v. Toth*, 668 F.3d 374, 377 (6th Cir. 2012), as was the case here. At Fontana's plea colloquy, the district court explained the waiver, and Fontana acknowledged that he understood. Furthermore, Fontana's pro se brief does not address why this waiver was not made knowingly and voluntarily, or even address the issue of waiver at all.

For the reasons set forth above, the judgment of the district court is affirmed and Fontana's motion to file a supplemental pro se brief is denied.