[PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 16-16505

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

JOHN J. UTSICK,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:10-cr-20242-CMA-1

_____

2                    Opinion of the Court                  16-16505

Before NEWSOM and MARCUS, Circuit Judges, and COVINGTON,[*] District Judge.

MARCUS, Circuit Judge:

John Utsick's legal problems began in 2006, when the U.S. Securities and Exchange Commission ("SEC") brought a civil action against Utsick, his entities, and others, alleging that they had sold unregistered securities to thousands of investors and defrauded them. *See SEC v. Utsick*, 373 F. App'x 924, 925 (11th Cir. 2010) (unpublished) ("*Utsick I*"). Following proceedings in the United States District Court for the Southern District of Florida, the trial court entered a final judgment, finding Utsick liable, ordering him to disgorge over $4,000,000 in funds, and placing two of his entities under receivership in order to sell and reorganize assets to repay investors. *Id.* at 925–26. Utsick appealed, but never contested his liability for violating the securities laws; instead, he challenged the calculations concerning his disgorgement, prejudgment interest, and civil penalty. *Id.* In Round One of this case, a panel of this Court affirmed. *Id.*

Utsick's problems mounted when the government instituted criminal proceedings against him arising out of his role in the elaborate Ponzi scheme. In November 2010, a federal grand jury sitting in Miami returned a superseding indictment that described -

---

[*] Honorable Virginia Covington, United States District Judge for the Middle District of Florida, sitting by designation.

- consistent with the district court's findings of fact in *Utsick I* -- how, between January 1996 and January 2006, Utsick had solicited large sums of money from investors under fraudulent pretenses; he failed to use investor funds for the purposes promised; and he concealed evidence of his misconduct. The indictment charged Utsick in nine counts with mail fraud, in violation of 18 U.S.C. § 1341, based on the mailing of nine checks by or to Utsick and his entities in furtherance of the scheme.

Before the authorities could arrest him, Utsick fled to Brazil. But after an extradition request was filed by the United States, the Supreme Court of Brazil allowed him to be extradited. He returned to the United States, and on the eve of trial, following over a year of pretrial proceedings, Utsick entered into a plea agreement, agreeing to plead guilty to one count of mail fraud. The district court later sentenced Utsick to 220 months' imprisonment and ordered him to pay $169,177,338 in restitution.

In this appeal, Utsick broadly argues two things: (1) that the custodial sentence imposed and the order of restitution violate the extradition treaty between the United States and Brazil, as well as the Brazilian court's extradition order that returned him to the United States for trial; and (2) that his guilty plea was not made freely and voluntarily, in part because the district court plainly erred in finding him competent to stand trial. After thorough review of an extensive record, we affirm.

I.

A superseding indictment, returned by a federal grand jury, charged Utsick with nine counts of mail fraud, each one tied to a check that had been mailed in service of his fraudulent scheme. One mailing took place in April 2005 (Count 1), seven in December 2005 (Counts 2–8), and one in January 2006 (Count 9).  In granting the American extradition request pursuant to long-standing treaty obligation, the Supreme Court of Brazil explained that a five-year statute of limitations defense in American law barred one of the counts of mail fraud found in the superseding indictment (Count 1, committed in April 2005), but that the remaining charges (Counts 2–9, committed in December 2005 and January 2006) were not barred by either country's statute of limitations.  The United States, in turn, conceded that it was "not authorized to proceed" on Count 1, and said that while it could introduce evidence about the entire scheme in court, it would redact Count 1 from the superseding indictment.

After extradition and arrest, Utsick pled not guilty. Throughout lengthy pretrial proceedings, Utsick raised a series of concerns about his mental health.  Early on, he gave notice of expert evidence concerning claimed diagnoses of bipolar I disorder and narcissistic personality disorder, which he said "diminished [his] capacity" to commit the charged crimes, but subsequently he withdrew that notice.  Later, Utsick renewed his intention to introduce mental health evidence, offering a summary of the proposed expert witness testimony of Dr. Michael Hughes, who would apparently testify about Utsick's bipolar disorder.  Dr. Hughes relied

on "his psychiatric evaluation and treatment of Mr. Utsick in 2005 and 2006 and his review of reports prepared by other psychiatrists and mental health professionals."

Based on these notices, the government moved the trial court to hold a competency hearing -- a request the court granted. At the hearing, the government called two experts to testify as to Utsick's mental health. Dr. Jose Gonzalez, a Bureau of Prisons psychiatrist, explained that he had treated Utsick and had diagnosed him with "anxiety disorder not otherwise specified and depressive disorder not otherwise specified." Dr. Gonzalez added that Utsick's mental health conditions were under control, he did not suffer from bipolar disorder, and he would be able to assist in his defense at a trial. Similarly, Dr. Lisa Feldman, a forensic psychologist who evaluated Utsick at the federal detention center in Miami, diagnosed him as suffering from adjustment disorder with mixed anxiety and depressed mood. She too opined that Utsick was competent, that he did not "suffer from a severe mental disorder or defect that would preclude his ability to understand the nature and consequences of the proceedings against him or his capacity to assist his attorney," and that he was "very much aware" of the charges and the penalties he was facing.

The defense emphasized at the hearing that Utsick was "not challenging whether he [was legally] competent," but rather was focusing "strictly on whether [he was] able to assist himself in trial." Utstick called Dr. Hughes to testify, but when the government asked to review the documents the doctor had brought with him

to the witness stand, Utsick withdrew him as a witness. The district court concluded that Utsick did not want to call Dr. Hughes to testify, and, since the defense had offered no other mental health expert, that Utsick was stipulating to his competency. In the absence of any evidence controverting the opinions offered by Drs. Gonzalez and Feldman, the court found Utsick competent to stand trial.

As the criminal proceedings progressed, Utsick also sought to limit the court's consideration of any evidence of misconduct that he engaged in before November 30, 2005. He claimed that Brazil's extradition treaty and the court order directed that he could not be held liable for, or sentenced based on any criminal action occurring before that date. The district court denied Utsick's repeated motions to exclude this evidence, explaining that he was not being held liable for conduct committed before November 30, 2005 since the government had agreed to redact Count 1 from the charging instrument, but that neither Brazil's treaty nor its extradition order limited the evidence the court could consider at trial. Utsick raised the issue again at a pretrial conference, and the district court again made it crystal clear that neither the treaty nor the extradition order limited the court's ability to consider Utsick's relevant conduct prior to the November 2005 date for evidentiary or sentencing purposes.

Just days before trial, Utsick agreed to plead guilty to one count of mail fraud -- Count 7, which charged the mailing of a $540,000 check by a victim to an Utsick entity on December 19, 2005. In turn, the government agreed to dismiss the remaining

counts against him. The plea agreement, signed by Utsick and his attorney on June 10, 2016, included a detailed factual proffer, which explained the fraudulent scheme, in relevant part, this way:

> From January 1996 through December 2005, in Miami-Dade County, Florida . . . Utsick[] devised a scheme and artifice to defraud investors by making false representations regarding his concert promotion business. Specifically, Utsick . . . represented to investors that he would use their money to invest in various concerts, tours, and other entertainment opportunities, and that investors would receive the greater of guaranteed 10% returns or shares of the profits from the various concert ventures. Individuals sent Utsick money for these investments based on those representations, as well as representations by others regarding the success of Utsick's investment opportunities. . . .
>
> On or about December 19, 2005, based on Utsick's fraudulent representations, an individual . . . mailed a check for $540,000 from Massachusetts to [an Utsick entity] in the Southern District of Florida using the United States Postal Service.

The proffer further revealed that Utsick's two companies lost so much money that by mid-2005 he owed his many investors hundreds of millions of dollars. Utsick also lost millions of investor money in stock options trading. Utsick "obtained approximately $253,942,517 from approximately 2,928 individuals based on his representations" and had not paid $203,477,335 of the money back

at the time a receiver took over the companies. The proffer also said that Utsick still owed investors $169,177,338.

Consistent with the factual proffer, Utsick's plea agreement provided that "[t]he [c]ourt must also order restitution, and the defendant agrees to pay restitution in the amount of $169,177,338." In addition, the agreement included a sentence appeal waiver provision, which waived all rights to appeal his sentence under 18 U.S.C. § 3742, "unless [it] exceeds the maximum permitted by statute [or treaty], or is the result of an upward departure or a variance from the Sentencing Guidelines range that the [c]ourt establishes at sentencing."

At a plea hearing, the district court questioned Utsick under oath and in considerable detail about the plea agreement, his state of mind, and his competency. Among other things, Utsick and both of his attorneys confirmed that he was competent to enter a guilty plea. The court asked the government to explain the elements of the charge to Utsick, and made sure that his counsel had explained the charge to him, along with the evidence arrayed against him, his available defenses, and his right to plead guilty or proceed to trial. The court reiterated the statutory maximum sentence and confirmed that Utsick had agreed to pay $169,177,338 in restitution. Furthermore, the district court delineated all of the constitutional rights he would be giving up by pleading guilty, including that at trial, he would be presumed innocent, the government would bear the burden of proving his guilt beyond a reasonable doubt, he had a right to remain silent and no inference could

be drawn if he chose not to testify, his lawyer would be free to confront and cross-examine any witnesses presented by the government, and he could present witnesses on his own behalf. Utsick confirmed that he understood everything the trial judge had told him. Towards the end of the hearing, counsel reconfirmed that Utsick was competent, that Utsick was knowingly and voluntarily waiving his rights, and that there was a sufficient factual foundation for the plea.

The presentence investigation report ("PSI") assigned Utsick a total offense level of 37 and a criminal history category I, which, in light of the 20-year statutory maximum, yielded a guideline range of 210 to 240 months. The PSI also noted that Utsick agreed to pay $169,177,338 in restitution.

Utsick objected to the imposition of a sentence based on "alleged fraud loss prior to November 30, 2005," arguing once again that any such sentence would violate Brazil's extradition treaty and the terms of his extradition. He also sought a downward departure or variance, claiming that his fraudulent intent did not begin until 2005 and that his bipolar disorder diminished his capacity to control his behavior, relying on the testimony of Dr. Hughes at a sentencing hearing. Upon the completion of a three-day hearing, the district court sentenced Utsick to 220 months' imprisonment, followed by a 3-year term of supervised release, and ordered him to pay $169,177,338 in restitution.

This timely appeal followed.[1]

## II.

We review *de novo* whether Utsick's sentence violated the terms of his plea agreement, his extradition order and the extradition treaty with Brazil. *United States v. Copeland*, 381 F.3d 1101, 1104 (11th Cir. 2004); *United States v. Puentes*, 50 F.3d 1567, 1575 (11th Cir. 1995) (interpretation of an extradition order and treaty is "subject to plenary review").

Normally, we review the legality of a restitution order *de novo*. *United States v. Robertson*, 493 F.3d 1322, 1330 (11th Cir. 2007). However, a challenge to restitution raised for the first time on appeal is subject only to plain error review. *United States v. Jones*, 289 F.3d 1260, 1265 (11th Cir. 2002). To establish plain error, a defendant must show that there was an (1) error, (2) that is plain, and (3) that affects substantial rights. *United States v. Castro*, 455 F.3d 1249, 1253 (11th Cir. 2006). Where all three conditions are

---

[1] A panel of this Court has already ruled that the sentence appeal waiver in Utsick's plea agreement barred him from raising some of the issues he raised in this appeal, including challenges to "(a) the manner in which the sentence was imposed, (b) the length of the sentence, and (c) the forfeiture and restitution orders." However, the Court allowed Utsick to challenge on appeal these issues "on the ground that they were contrary to the treaty by which he was extradited." Accordingly, we address those arguments in this opinion, except for any arguments concerning forfeiture. While Utsick initially challenged on appeal aspects of a putative forfeiture, he admits, in reply, that no forfeiture order was entered by the district court.

met, we may then exercise our discretion to notice a forfeited error, but only if the error seriously affects the fairness, integrity, or public reputation of judicial proceedings. *Id.*

While we review a preserved claim challenging a factual finding of competency for clear error, we review it for plain error if the defendant failed to object to the district court's competency determination. *United States v. Rodriguez*, 751 F.3d 1244, 1251 (11th Cir. 2014); *United States v. Bradley*, 644 F.3d 1213, 1267 (11th Cir. 2011). Similarly, where a defendant neither objects to the plea proceedings nor moves to withdraw the plea, we review the district court's compliance with Federal Rule of Criminal Procedure 11 for plain error. *United States v. Monroe*, 353 F.3d 1346, 1349 (11th Cir. 2003). "[A] defendant who seeks reversal of his conviction after a guilty plea, on the ground that the district court committed plain error under Rule 11, must show a reasonable probability that, but for the error, he would not have entered the plea." *United States v. Dominguez Benitez*, 542 U.S. 74, 83 (2004). In addition, all Rule 11 violations are subject to harmless-error review; an error is harmless "if it does not affect substantial rights." *See* Fed. R. Crim. P. 11(h); *United States v. Davila*, 569 U.S. 597, 610–11 (2013).

### III.

Utsick's primary claim is that his sentence violated the terms of his extradition order, the extradition treaty between the United States and Brazil, and the international law doctrine known as "the rule of specialty." The "rule of specialty" stands for the proposition

that, in extradition cases, the requesting state, which secures the surrender of a person, can prosecute that person "only for the offense for which he or she was surrendered by the requested state or else must allow that person an opportunity to leave the prosecuting state to which he or she had been surrendered." *Gallo-Chamorro v. United States*, 233 F.3d 1298, 1305 (11th Cir. 2000). Specifically, Utsick claims that the order, the treaty, and the rule of specialty barred the district court from relying on his conduct prior to November 30, 2005 to determine his sentence, but that the district court erroneously did so anyway.  We are unpersuaded.

For starters, Utsick relies on several provisions of Brazil's extradition treaty with the United States, but these provisions speak to only the *crimes* a defendant may be prosecuted for, rather than how his sentence may be determined.  Thus, Article V of the treaty provides that *"[e]xtradition* shall not be granted . . . [w]hen the legal proceedings or the enforcement of the penalty *for the crime or offense committed* has become barred by limitation according to the laws of either the requesting State or the requested State."  Treaty & Additional Protocol Signed at Rio De Janeiro Jan. 13, 1961, and June 18, 1962, Respectively ("Brazil Treaty"), art. V, Dec. 17, 1964, 15 U.S.T. 2093  (emphases added).  The Brazilian court expressly granted Utsick's extradition for each of the charges allegedly committed on December 2, 2005 (that is, Count 2) and afterwards (Counts 3–9).  All of the parties agree that Utsick's Count 7 offense (the charge of conviction) was committed on or about December 19, 2005, within the applicable five-year limitations period set forth

in 18 U.S.C. § 3282. Neither "the legal proceedings" for Count 7, nor the "enforcement of the penalty" for that count were barred by any statute of limitation in Brazil or in the United States. Under Article V, therefore, his extradition was properly granted for Count 7 and he could be penalized for committing that offense.

Article XI of the treaty between the United States and Brazil provides that "[t]he determination that extradition based upon the request therefor should or should not be granted shall be made in accordance with the domestic law of the requested State." Brazil Treaty, art. XI. But this provision governs only how a country decides to grant or deny extradition; it does not authorize the requested country to limit the other country's punishment of the defendant.

Finally, Article XXI of the treaty, which enshrines the "rule of specialty," provides that "[a] person extradited by virtue of the present Treaty may not be tried or punished by the requesting State for any crime or offense committed prior to the request for his extradition, *other than that which gave rise to the request.*" Brazil Treaty, art. XXI (emphasis added). In other words, invoking the concept behind the rule of specialty, Article XXI bars the trial or punishment for any offense other than the offense or offenses for which a person has been extradited. However, what "gave rise to the [extradition] request" was Utsick's fraudulent securities scheme, so he was properly prosecuted for Count 7, which arose out of that scheme. Article XXI says nothing about restricting how

a court may impose punishment for a conviction of the crime alleged in Count 7.

Utsick also cites to the comments of the Brazilian Supreme Court, but to no avail. The Federal Supreme Court's judgment refused extradition for Count 1 because it was committed before November 30, 2005, but "upheld" the extradition "in part" because, "[a]s for the other acts from December 2, 2005, no extinction of criminal liability [sic]." Then, in denying Utsick's "Third Request for Amendment of Judgment," Justice Dias Toffoli made clear that the original court judgment, "in partially rejecting the [extradition] request, has only excluded from possible autonomous imposition of sentence (or specific increase for these acts), the conducts narrated in the *indictment* as being practiced between 4/13 and 4/14/05." In the quoted language, both the judgment and Justice Dias Toffoli referred to the extinction of criminal liability and enforcement of penalty for Count 1, the offense committed on April 13–14, 2005. In full compliance, the United States did not seek and the district court did not impose any punishment for the crime charged in Count 1. But notably, neither Justice Dias Toffoli nor the judgment itself limited in any way what evidence could be introduced at sentencing for Count 7.

If anything, the Brazilian court expressly contemplated that Utsick's scheme included a decade's worth of misconduct. The Federal Supreme Court's judgment detailed that Utsick had operated a "SCHEME AND DECEPTION," specifically, a "'Ponzi' scheme" that operated "from January 1996 to January 2006." The

Brazilian court further observed that "[d]uring the aforementioned period," when Utsick's companies were losing money, Utsick "told investors that the money invested in [Utsick's companies] would only be used for entertainment projects." And "[a]s part of the scheme and deception, [Utsick] eventually succeeded in inducing investors, and causing the inducement of investors by the fraudulent means described above, to provide" new funds to him and his entities, through the mailings that resulted in the counts for which he was extradited. The Brazilian court well understood that Utsick's unlawful mailings stemmed from conduct that occurred long before the November 2005 date.

Indeed, viewing the scheme as a whole tracks exactly how the federal courts approach sentencing. Generally speaking, when imposing a sentence for an offense like mail fraud, the proper calculation of the guidelines requires the district court to consider "all relevant conduct," not merely charged conduct. *Rodriguez*, 751 F.3d at 1256 (quotation omitted). Relevant conduct includes "all acts and omissions . . . that were part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. § 1B1.3(a)(2).

In this case, the relevant conduct the district court could consider in sentencing Utsick encompassed his role in the massive 10-year Ponzi scheme that led to the mail fraud offense to which he pled guilty. As we've detailed, Count 7 involved a check that was mailed on December 19, 2005 by an investor to an Utsick entity, in furtherance of Utsick's larger scheme. In the factual proffer

incorporated in his plea agreement, Utsick expressly stipulated to the facts that the check identified in Count 7 was mailed based on the "fraudulent representations" he made in furtherance of his fraudulent "scheme," that his scheme lasted "[f]rom January 1996 through December 2005," that from the scheme he "obtained approximately $253,942,517 from approximately 2,928 individuals," that "over 25 of those individuals have suffered substantial losses of their retirement, savings, or other investment funds," and that "individuals are still owed $169,177,338." In fact, the defense reaffirmed at the sentencing hearing that Utsick agreed, in accordance with the plea agreement, that he was subject to a total offense level of 37, which, along with his criminal history category of I, resulted in an advisory guideline sentencing range of "210 to 240 months imprisonment on Count 7," calculated on the basis of the very terms he now disputes.

This approach is consistent with how we have previously applied the rule of specialty in a case similar to this one. *United States v. Garcia*, 208 F.3d 1258, 1261 (11th Cir. 2000), *vacated and remanded on other grounds by* 531 U.S. 1062 (2021), *reinstated by* 251 F.3d 160 (11th Cir. 2001). In *United States v. Garcia*, the defendant was indicted and extradited from Canada to the United States for conspiracy to distribute drugs, for possession of those drugs, and for use of a firearm in connection with the conspiracy and possession charges. *Id.* at 1260. In imposing sentence, the district court accounted for conduct not charged in the indictment -- namely, other drug offenses and a homicide. *Id.* We upheld the

sentence in the face of the defendant's rule-of-specialty challenge. *Id.* at 1261.

As we explained, "the consideration of other conduct in the sentencing process is legally and conceptually a part of the punishment for the ind[i]cted crimes and within the limits set for those crimes." *Id.* at 1261. Thus, when sentencing after extradition, the rule of specialty does not "restrict the scope of proof of other crimes that may be considered in the sentencing process" and "does not control the evidentiary procedural rules of American Courts." *Id.* So while the rule of specialty bars "proof of other crimes in order to exact punishment for those other crimes," it does not bar "proof of other crimes as a matter germane to the determination of punishment for the extradited crime." *Id.*

*Garcia* was vacated on grounds unrelated to its rule-of-specialty holding, and a vacated opinion has "no legal effect whatever." *United States v. Sigma Int'l, Inc.*, 300 F.3d 1278, 1280 (11th Cir. 2002) (en banc) (per curiam). But even if it is not precedential, we find *Garcia*'s reasoning to be persuasive and apply it in this case. *Cf. Friends of Everglades v. S. Fla. Water Mgmt. Dist.*, 570 F.3d 1210, 1218 (11th Cir. 2009) ("We are free to give statements in a vacated opinion persuasive value if we think they deserve it."). Moreover, our sister circuits have consistently applied the same rule announced in *Garcia*. *See United States v. Fontana*, 869 F.3d 464, 471 (6th Cir. 2017) (alteration adopted) ("[I]t is clear that the district court's consideration of [the defendant's] uncharged but related conduct did not constitute 'punishment' within the meaning

of the . . . treaty, but only an appropriate consideration in determining the sentence for the crimes for which [the defendant] was properly extradited."); *United States v. Lomeli*, 596 F.3d 496, 502 (8th Cir. 2010) ("[T]he doctrine of specialty does not operate to bar consideration of all pre-extradition conduct when determining a defendant's punishment for the extradited offense."); *United States v. Lazarevich*, 147 F.3d 1061, 1064 (9th Cir. 1998) ("Given the long history of consideration of relevant evidence -- including other criminal behavior, the Sentencing Guidelines' clear mandate of such consideration, and Supreme Court precedent, we conclude that the [t]reaty and the extradition agreement contemplated consideration of relevant offenses."); *United States v. Davis*, 954 F.2d 182, 187 n.2 (4th Cir. 1992) ("Clearly, judicial consideration, during sentencing, of a prior offense is an analytically distinct concept from punishing on the basis of that offense."); *see also United States v. Meza-Rojas*, 480 F. App'x 784, 788 (5th Cir. 2012) (collecting cases for the same proposition); *United States v. Adeyinka*, 410 F. App'x 986, 990 (7th Cir. 2011) (same).

Just as in *Garcia*, the district court did not err in considering evidence of Utsick's conduct that pre-dated November 30, 2005 in determining his sentence. Neither the treaty, the Brazilian court's judgment or order, the rule of specialty, Utsick's indictment, his plea agreement, or anything else limited the relevant conduct the district court could consider in imposing sentence. Utsick's relevant conduct was germane in fashioning an appropriate sentence.

Utsick's related arguments, claiming that the extradition treaty barred certain terms of punishment, also are without merit. In particular, Utsick complains that the 220-month term is "effectively a life sentence," in violation of the treaty. But the Brazil Treaty limits only the circumstances in which "the death penalty will . . . be imposed," not a life sentence or any term of years. Brazil Treaty, art. VI. Utsick does not point to any provision that bars a life sentence, nor any "promise to Brazil that [he would] not be given a sentence that would likely have him die in custody." The record fully reflects that Utsick agreed to be sentenced subject to a 20-year maximum term, and his 220-month sentence is near the low end of his agreed-upon 210-to-240-month range.

Nor do we find any merit in his challenge to the restitution order -- an issue we review only for plain error since Utsick did not raise in district court any claim that the restitution amount violated the treaty. *See Jones*, 289 F.3d at 1264. We begin by observing that it is unclear how much Utsick actually thinks he should be required to pay in restitution. He says only that his relevant conduct for Count 7 results in an amount of loss of less than $3,400,000, allegedly based on the loans or investments sent to his business in or after December 2005, and that restitution "did not reach [ ] more than $150 million." But other than offering these vague statements, which do not establish the restitution amount that he should pay, Utsick has not told the court what restitution amount would be proper.

20                          Opinion of the Court                    16-16505

The district court ordered him to pay restitution in the amount of $169,177,338 -- the specific amount he agreed to in the plea agreement and at the plea colloquy. At the plea colloquy, this exchange occurred:

> THE COURT: Paragraph 4 informs you that the maximum possible sentence you face as to Count 7 is 20 years' imprisonment followed by supervised release of up to three years, a fine of up to $250,000, as well as restitution. And you are agreeing to pay restitution in the amount of 169,000 -- I'm sorry, $169,177,338.
>
> Do you understand and agree?
>
> THE DEFENDANT: Yes.

Moreover, defense counsel confirmed at sentencing that Utsick "already stated he's willing to pay restitution," and while counsel commented that "be[ing] realistic, he's not going to be paying 169 million," that was only because "he doesn't have it."

The district court also repeated at sentencing -- without any objection -- that Utsick had agreed to the restitution amount, when it said:

> In total, Utsick obtained approximately $253,942,517 from approximately 2,928 individuals based on his representations of the success of his companies and the promise of guaranteed, positive returns. At the time [ ] a Court-appointed Receiver took over the operation of the companies on January 18, 2006, Utsick had not paid back $203,477,335 of that money.

> Utsick used some of that money for his benefit and
> the benefit of others; and not counting payments to
> individuals who had received more than they have
> had invested, Utsick had not paid back investors
> $207,185,420 at the time the Receiver took over these
> companies.

> After the Receiver took over and sold various assets
> of the companies and recovered money based on var-
> ious claims, individuals are still owed $169,177,338.
> Many of those people invested large sums of money
> from their retirement accounts, and over 25 of those
> individuals have suffered substantial losses of their re-
> tirement savings or other investment funds.

> When I asked Mr. Utsick on June 10 [at the plea col-
> loquy] whether all those facts were true and correct,
> he answered yes.

On this record, there can be no doubt that Utsick agreed to
the restitution amount the district court ordered. What's more,
our review of the treaty and the extradition order reveals nothing
in there or anywhere else that barred the amount of restitution that
could be set as punishment for his crime. *Garcia*, 208 F.3d at 1261.
This makes sense. When setting restitution for a crime like mail
fraud -- which includes as an element "a scheme to defraud," *see
United States v. Sharpe*, 438 F.3d 1257, 1263 (11th Cir. 2006) (quo-
tation omitted) -- we've long understood that the amount would
take into account relevant conduct. *United States v. Dickerson*,
370 F.3d 1330, 1339 (11th Cir. 2004) (quotation omitted) ("[W]hen
the crime of conviction includes a scheme, conspiracy, or pattern

of criminal activity as an element of the offense, the court may order restitution for acts of related conduct for which the defendant was not convicted"); *see also United States v. Brown*, 665 F.3d 1239, 1252 (11th Cir. 2011) ("[R]estitution orders for conduct closely related to the offense of conviction are appropriate under [the Mandatory Victim Restitution Act], in addition to the specific conduct for which the defendant was convicted."). Utsick has given us no reason to view his case differently. We can find no error, much less plain error in the district court's calculation of the restitution amount that Utsick owes. *Castro*, 455 F.3d at 1253.

## IV.

Utsick also claims, for the first time on appeal, that he entered his guilty plea "without a clear understanding of the parameters" of his conviction, and that he lacked the requisite mental competence to knowingly enter into the plea agreement. Again, we are unpersuaded.

Under Rule 11, the district court must address the defendant personally in open court and inform the defendant of -- and determine that he understands the nature of -- the charge to which the plea is offered and the potential consequences of that plea. *United States v. Lewis*, 115 F.3d 1531, 1535 (11th Cir. 1997). The rule requires a district court to conduct a searching inquiry into the voluntariness of a defendant's guilty plea and ensure that the defendant "is aware of the direct consequences of his plea." *United States v. Siegel*, 102 F.3d 477, 481 (11th Cir. 1996); *United States v. Lejarde-Rada*, 319 F.3d 1288, 1291 (11th Cir. 2003).

To determine whether a guilty plea is knowing and voluntary, a court must comply with the three "core concern[s]" of Rule 11, by ensuring that: (1) the guilty plea is free from coercion; (2) the defendant understands the nature of the charges; and (3) the defendant understands the direct consequences of his plea. *United States v. Presendieu*, 880 F.3d 1228, 1238, 1240 (11th Cir. 2018) (quotation omitted).

Compliance with the second core concern -- that the defendant understands the nature of the charges -- depends on a variety of factors, including the complexity of the offense and the defendant's intelligence and education. *Id.* at 1238. However, the court need not list each specific element of the offense. *Id.* We have explained:

> In simple cases, for example, the district court may only need to read the indictment and afford the defendant an opportunity to ask questions. The district court may be required to give a more detailed explanation, however, in more complex cases, such as those involving "esoteric terms or concepts unfamiliar to the lay mind."

*Id.* at 1239 (quoting *United States v. James*, 210 F.3d 1342, 1345 (11th Cir. 2000) (per curiam)).

To comply with the third core concern -- that the defendant understands the direct consequences of his plea -- the district court must inform the defendant of the rights that he will give up by pleading guilty and other relevant matters, including: the right to plead not guilty (or persist in such a plea) and to be represented by

counsel; the possibility of forfeiture; the court's authority to order restitution and its obligation to apply the guidelines; and the possibility of a perjury prosecution for false statements made under oath. *United States v. Moriarty*, 429 F.3d 1012, 1019 (11th Cir. 2005); *see also* Fed. R. Crim. P. 11(b)(1).

We base our determination of whether the core concerns were satisfied by reviewing the record of the Rule 11 hearing, including any written plea agreement. *United States v. Jones*, 143 F.3d 1417, 1420 (11th Cir. 1998). We strongly presume that the statements made during a plea colloquy are true. *United States v. Medlock*, 12 F.3d 185, 187 (11th Cir. 1994). Portions of the record apart from the plea hearing transcript may also aid in the determination of whether the defendant understood the consequences of his plea. *See United States v. Vonn*, 535 U.S. 55, 74–75 (2002).

A district court, on its own motion or on a party's motion, may order a hearing to determine whether a defendant is competent to proceed. 18 U.S.C. § 4241(a). At the hearing, the defendant "shall be represented by counsel and . . . afforded an opportunity to testify, to present evidence, to subpoena witnesses on his behalf, and to confront and cross-examine witnesses who appear at the hearing." *Id.* §§ 4247(d), 4241(c) (stating a mental competency hearing "shall be conducted pursuant to the provisions of section 4247(d)"). The district court is the factfinder at the competency hearing. *Id.* § 4241(d). Prior to the hearing, the district court may order a psychological or psychiatric evaluation of the defendant. *Id.* § 4241(b). To be competent, a defendant must have "sufficient

present ability to consult with his lawyer with a reasonable degree of rational understanding . . . [and] ha[ve] a rational as well as factual understanding of the proceedings against him." *United States v. Rahim*, 431 F.3d 753, 759 (11th Cir. 2005) (quotation omitted).

To begin, because Utsick never objected to the district court's competency determination, we review this argument for plain error, and we can find no error, plain or otherwise. As the record reflects, despite Utsick's repeated statements that he was competent, the district court granted the government's unopposed motion for a competency hearing, following statutory procedures and ordered an examination before the hearing to quell any doubts as to his competency. *See* 18 U.S.C. §§ 4241, 4247. At the hearing, two doctors testifying on behalf of the government -- both of whom had examined Utsick -- offered their expert opinions that Utsick was competent and would be able to assist in his defense at trial. For the defendant's part, he never introduced any evidence that he was incompetent; to the contrary, his attorney stated that the defense "stipulated to [Utsick's] competence" and that "we were never saying that he was not competent." The district court found that, "based on the only testimony I have received and the only evidence before me, . . . Mr. Utsick is, in fact, competent."

Then, during the later change-of-plea colloquy, both Utsick and his counsel repeatedly assured the district court of his competency, his opportunities to consult and satisfaction with his attorneys, and his understanding of the charges, his legal rights, the terms of the plea agreement, and the consequences of pleading

guilty. And before the district court accepted Utsick's plea and found it to be knowing and voluntary, defense counsel reaffirmed that Utsick "is competent and is making a knowing and voluntary waiver of his rights and that there is a sufficient factual basis for his plea of guilty." All told, there is no basis to conclude that the district court erred, plainly or otherwise in finding Utsick competent.

As for Utsick's broader claim that the district court generally violated Rule 11 -- by failing to make sure that Utsick understood the nature of the charges and the direct consequences of his plea -- again we can find no error, plain or otherwise. Utsick pled guilty to a relatively straightforward crime -- mail fraud in violation of 18 U.S.C. § 1341. The elements of mail fraud are (1) an intentional participation in a scheme to defraud a person of money or property, and (2) the use of the mails in furtherance of the scheme. *Sharpe*, 438 F.3d at 1263. The facts of Utsick's crime were detailed in the plea agreement and proffer, which he said he read and understood.

The district court judge then went to great lengths to ensure that Utsick understood the nature of his charges -- not only did she satisfy herself of his competency, she asked the prosecutor to read aloud each element of the crime at the colloquy; defense counsel confirmed that he had reviewed those elements with Utsick; Utsick agreed that he'd had "the opportunity of reviewing this [plea] agreement and discussing it fully with [his] attorneys before [he] signed it"; and the court read out the provisions of the plea agreement, including the sentencing calculations and recommendations

to which Utsick was stipulating. *See Presendieu*, 880 F.3d at 1238. The district court asked whether it was Utsick's intention to plead guilty, pursuant to the written plea agreement the parties had provided to the court, and Utsick affirmed that it was, that no one had made him any other promises, that no one had coerced him, and that he was pleading guilty because he was guilty. We are satisfied that Utsick's plea was knowing and voluntary.

Utsick argues nevertheless that his plea was not knowing and voluntary because the district court did not address in the colloquy whether Utsick's conduct before November 30, 2005 could be considered for sentencing purposes. But as we've described, Utsick was told by the district court -- several times during the pretrial proceedings -- that his conduct before the November 2005 date would be considered relevant conduct for sentencing purposes, and even again at the plea hearing, right before he pled guilty. Each time, the district court explained that nothing barred the admission or consideration of any relevant conduct, no matter when it occurred.

Despite these repeated -- and consistent -- rulings, Utsick proceeded to negotiate and sign a plea agreement and factual proffer agreeing to be sentenced and pay restitution based on the scope of the conduct, the number of victims, and the dollar amounts arising out of the relevant conduct. The district court discussed those terms with him, and he assured the court of his understanding. Moreover, Utsick does not cite any case from our Court or the Supreme Court where a district court violated Rule 11 by not

discussing a ruled-upon treaty objection, so there could be no plain error in the district court's finding that Utsick understood the nature of his charges. *Castro*, 455 F.3d at 1253.

Nor is there any support for his newly-minted argument that he did not understand the direct consequences of his plea. Among other things, the district court ensured at the colloquy that Utsick understood the legal consequences if the court were to accept his guilty plea, including the loss of his right to vote, hold office, serve on a jury, and other civil rights. As we have seen, the district court also specifically discussed the other constitutional rights that Utsick would be giving up by pleading guilty, and asked whether Utsick understood that he would be giving up all of the rights we associate with trial as well as with appeal. Utsick said that he did.

Nothing in the record suggests any confusion or lack of understanding on Utsick's part about his intention to plead guilty or his acceptance of his own bargained-for sentencing consequences. Utsick does not even identify which incriminating statements he made during the plea colloquy that he would not have made if he was informed differently, and it is not clear how not making these statements would have prevented him from entering the guilty plea or how he could otherwise satisfy harmless-error review. *Dominguez Benitez*, 542 U.S. at 83; Fed. R. Crim. P. 11(h). And to the extent the defendant now argues that the district court should have conducted the plea colloquy in a certain order, he fails to explain how the colloquy constituted a breach of Rule 11, let alone a violation warranting plain-error relief. *Castro*, 455 F.3d at 1253. As

16-16505               Opinion of the Court                    29

we've said, nothing "requires district courts to elicit an express guilty plea in the manner posited." *Moriarty*, 429 F.3d at 1020.

The district court fully satisfied the core concerns of Rule 11, and we can discern no reason to conclude that the district court plainly erred in finding that Utsick's guilty plea was entered knowingly and voluntarily. *Presendieu*, 880 F.3d at 1238.

**AFFIRMED.**